In the Weber State University Administration
Before the Faculty Review Board

Complaint of ████████████,

Complainant

V.

Professor Jason M. Fritzler,

Respondent

Appeal From the Provost's Imposed Disciplinary Actions;
Findings and Conclusions

**Prepared by:**

**Brian K. Jackson**
**Brian K. Jackson, LLC**
**341. S. Main St. Suite 500**
**Salt Lake City, UT 84111**
**Phone: 801-441-8922**
**Fax: 801-534-1948**
**E-mail:** brianj@bjacksonlaw.com
**Attorney for Dr. Jason M. Fritzler**

# Table of Contents

1.  Preliminary Statements of Underlying Issues on Appeal            .         .         3

2.  Introduction         .         .         .         .         .         .         .         .         5

3.  Factual Summary.         .         .         .         .         .         .         .         .         7

4.  Issues on Appeal         .         .         .         .         .         .         .         .         36

    A.  Summary of how Weber State's Policy is supposed to be implemented .         38

    B.  Preliminary due process procedure statements.         .         .         39

    C.  Rights deprived during the pre-investigation and investigation phase         40

    D.  Rights deprived during the post-investigation phase.         .         .         53

    E.  Rights deprived after no resolution is met with the disposition and informal

        conciliatory meeting         .         .         .         .         .         .         .         60

5.  Request to the Faculty Board of Review.         .         .         .         .         .         66

6.  Request for reimbursement of attorney fees.         .         .         .         .         .         67

## Preliminary Statement of the Underlying Issues on Appeal

1. Professor Fritzler maintains and has maintained throughout this case, that the evidence brought against him was false and fabricated. *(see the Professor's Reply to the Complainant's Complaint and the University's Investigation Report)*

2. The University made a finding of policy violations that Professor Fritzler was never accused of originally and the University never amended the original complaint to show a policy violation.

3. The University violated Professor Fritzler's procedural due process, his right to notice and his right to respond to allegations brought against him and review evidence of allegations brought against him, his right to a hearing, his right to innocence until proven guilty, his right to review evidence, his right to make an oral presentation, his right to be tried before his colleagues, his right to have the accuser present the case and his right to cross examine any witnesses, and his right to appeal any recommendation for disciplinary action before the recommendation is sent to the University President.

4. The University failed to file a complaint against Professor Fritzler and ultimately found him guilty of claims and disciplined him without that complaint. There is no complaint pending with the Faculty Board of Review against the Professor.

5. The factual evidence relied on by the University Provost when she formally disciplined the Professor without due process does not support a finding of policy violation and the University failed to follow procedure in determining whether or not the disciplinary action was necessary.

6. The investigator on this case was not impartial. The University refused to change investigators at the request of the Professor.

7. His constitutional rights to remain silent, his right from unreasonable searches and seizures, his right to an attorney, his right to privacy and his fundamental right to his liberty in his profession and career and Weber State were all deprived by government interaction without due process of law.

8. The University did not follow their own policy for a formal procedure in this matter, they treated this matter like it was a formal proceeding, absent a formal hearing

and instead found the Professor guilty of and disciplined him under quasi formal and informal proceedings absent the Faculty Board of Review.

9.  The University's own procedure is lacking and violates the Professor's constitutional rights.

10. The Professor was never given the actual evidence used against him, the evidence contained unsigned witness statements with lack of that of the investigation, the Professor's evidence and claims were never investigated and he was never given a chance to respond to and examine the evidence that was entered when a reinvestigation had to be conducted due to the impartiality of the original investigator.

11. As a result of the procedural issues involving this case, the Faculty Review Board would not have jurisdiction to review the actual allegations since no formal complaint is before the board, but the reprimand made in violation of due process, does need to be reversed and vacated.

# I.      Introduction

This is a case alleging sexual harassment from a University Professor who had been tenured with this institution for over five years. The formal complaint and allegations in summary, allege that this Professor threatened expulsion of one of his students if she refused to have sex with him. The formal complaint and allegations further allege that the parties had sex, against the complainants will, four times. The allegations go on to state that this type of relationship caused so much anxiety and stress to the student that on January 20th, she cancelled all of her classes.

The Professor maintained that these sexual harassment allegations were false and provided alibi witness statements to prove otherwise, including a statement from his wife. The University investigator made a contradictory finding of sexual harassment and unfounded and baseless finding of retaliation, both of which were later reversed by the University Provost and the matter had to be reinvestigated on issues raised by the Professor. Thereafter, the Provost found violations of University policy that was not enumerated in the complaint, violating the Professor's right to notice outlined under University Policy.

Also, the University disciplined the Professor under a provision of University policy that it was not authorized to discipline under. The University Provost also formally disciplined the Professor with a written reprimand and "acceptance of his resignation" despite the Professor notifying the University of his resignation two months prior due to harassment, discrimination and the hostile work environment this poorly and illegally conducted investigation created. The Provost had no power to formally discipline the Professor absent a written agreement from the Professor and the accuser of accepting that form of discipline. The professor was never afforded a chance to appeal the disciplinary action before it was implemented.

As a result, the only way that the Professor could have been formally disciplined was through a factual finding of the Faculty Review Board and a recommendation to the University President of proposed disciplinary action based off of the factual finding after a formal hearing had been conducted. Also, the only way a complaint could be filed was through the faculty review board. This never happened.

The investigation violated the Professor's constitutional rights which include his 4th, 5th and 6th amendment rights. The investigation was also not impartial and the investigator instead acted as an advocate for the accuser. The investigator found the Professor guilty before even speaking with the Professor, even producing evidence or investigating the matter. The investigator acted under policy that was reserved for the Faculty Review Board as if he was the Faculty Review Board. The investigator did not investigate issues and witnesses requested by the Professor and only "assumed" their authenticity without a factual determination.

The Professor was not afforded the right to cross examine witnesses before disciplinary action was established and recommended. The Professor was not afforded the right to examine the evidence and respond to the evidence produced by the Provost.

As a result, the Professor requests that the Faculty Review Board vacate, remove and expunge, the disciplinary action made against the Professor due to violation of his constitutional due process rights for among other things, his denial of his right to a formal hearing, his denial of his right to proper procedure and notice of a formal complaint filed against him, his right to an impartial investigation, his right to appeal a disciplinary action before it is implemented, his right to have the Faculty Review Board make the factual determination, the need for the accuser to file the formal complaint which was never filed on this matter and these proceedings should therefore be dismissed due to the Faculty Review Board's inability to have jurisdiction over an issue without a formal complaint and other University Policies enumerated herein.  He also requests that he be reimbursed for his attorney fees he has expended as authorized under University Policy.

The Professor also requests a change in the University Policies to comply with federal and state law and with its own enumerated rights and procedures. The Professor also requests an further investigation into the University officials named in this document who violated University policy and state and federal law in conducting this matter and the appropriate disciplinary action including removal and or reprimand.

## II.     Factual Summary[1]

Professor Jason Fritzler has a Bachelor in Animal Science and PHD in Microbiology. He graduated with a PHD in 2008, and later taught at a small university in Texas for four years and then started his tenure at Weber State University in July of 2012.

Professor Fritzler has received high praise from students and professors for his ability to teach students. None of his colleagues or prior students have ever noticed any unusual activity in regards to any kind of unwanted sexual approaches toward students or faculty during his tenure with the University. He is married to his wife Doctor Camille Fritzler where they met in Texas. His wife also has a Doctorate of Physical Therapy and ran her own practice for three years prior to them being forced out of Utah by University administration.

The couple do everything together and are happily married. This includes University-associated activities with students on and off campus. They couple are always together unless their schedules do not allow them to be. Many students across campus know the Professor's wife and know and understand the relationship they have, the students interact with her, students talk about the two of them to the Professor and to his wife and among other classmates.

Throughout his career, he has provided constant and consistent service to the students across multiple departments, colleges and universities. His history of service and teaching has always been exceptional which can be confirmed through numerous annual evaluations, student evaluations, attainment of early tenure and promotion, and through being nominated for and or receiving numerous awards, honors and recognitions. He has never been accused of any wrongdoing in the past, especially one of the nature in the allegations of this complaint.

Professor Fritzler makes comments to students in all of his courses, whether they are male, female, transgender, gay or lesbian and regardless of race, color, national origin, religion age and disability. He frequently makes comments to his students as a professor such as "Don't mess up" and "You're doing it wrong" as part of his character as well as comments like "Wow! I'm so proud of you!" "You're so strong." Ms. XXXXX was treated no differently than the rest of his

---

[1] Factual summary pulled from Reply to Barry Gomberg's investigation Report except for the Final Decision made by the University's Provost.

*Doctor Jason Fritzler*
*Weber State University*
*Faculty Review Board Appeal 7*

students.

**Electronic communication**

Professor Fritzler communicates with all of his students through his e-mail. The first day of class, Professor Fritzler tells his students to email him using his regular Weber e-mail address and not using Canvas, as he does not log into canvas on a regular basis. There is a Canvas application that students and faculty can log into though entering a username and password one-time, thereafter, there is no further prompt for needing to log-in again.

Messages can be sent through the application between students and professors. Professor Fritzler has never used this application to communicate with students as his primary source of communication and.. Also, the only time that Professor Fritzler would know if he had a message on Canvas system is if he were to log onto Canvas and go to the e-mail section of canvas. The Canvas system also only works when a student is enrolled in a class with a professor and after the semester is over, the ability to communicate is terminated.

Additionally, there was an issue that occurred on campus where several faculty members were hacked by students. Professor Fritzler was one of those faculty members. His e-mails, canvas pages, secure testing programs and computers were hacked. The Information Technology team on campus has still yet to determine what happened nor have provided answers to Professor Fritzler on what information specifically was targeted.

There have been reports by faculty members of individuals remotely accessing computers. A fellow colleague of Professor Fritzler watched someone remotely going through his files just a in the Spring 2017 semester. This faculty member recently served on the Faculty Review Board, and this incident coincidentally occurred just a few days after Professor Fritzler's counsel submitted a GRAMA request for past sexual misconduct cases investigated by Mr. Barry Gomberg (which was denied). Even though Professor Fritzler's computer was also accessed during this same time, the IT team on campus still has not looked into his specific issue.

Instead, IT purportedly has claimed that it was from a program called Identity Finder. However, that claim does not purport to the specific files that were opened and the ability to access stored login information on servers, both issues that Professor Fritzler reported to IT.

At the time the complaint was filed and thereafter, Professor Fritzler did not have access to or had not seen any of the Canvas messages that have been produced in this case. Professor Fritzler also mentioned messages that he did receive and get notification of in January of 2017 of Ms. XXXXX contacting him on January 13th, stating that she was dropping all of her classes and

why and how, and messages to Ms. XXXXX about the literature review course in the Fall of 2016 to Barry Gomberg. These messages were never produced into evidence by Mr. Gomberg or anyone else.

Professor Fritzler admits that the e-mail address in the e-mails produced is in fact his e-mail address which he shares with his wife and that she has access to. He has never seen the alleged e-mails that were produced. He also received an email from his own e-mail address on February 21st after a meeting with Barry Gomborg [sic] which said "Heard it didn't go well with gomberg the other day. Well it won't get any better." (Exb. G)

**Relationship of Professor and Complainant**

Mr. XXXXX enrolled in a lab course for the Principles of Microbiology with Professor Fritzler in the Fall of 2014, MICR 2054. The complainant had a course with Professor Fritzler in the Spring of 2015, a 5 credit-hour medical microbiology class MICRO 3305 which she ultimately failed due to lack of effort, and attendance issues, which are documented. Ms. XXXXX was enrolled in that course again with Professor Fritzler in the Spring of 2017 in order to try and have the failing grade removed from her GPA calculation.

Professor Fritzler knew Ms. XXXXX as overall, having a poor academic performance.  Ms. XXXXX was also known by her Professors and her students to sleep in her car in-between classes and constantly skipped her classes. Professor Fritzler as well as most other faculty and students were also aware of her work hours and her employment. She would also talk about those topics openly in her Fall MICR 4252 lab course where Professor Fritzler was present to assist course instructor, Professor Matthew Domek.

Professor Fritzler's relationship with Ms. XXXXX was no different than what is exhibited by all other Microbiology faculty and other students and no different than that of numerous faculty members across campus with their respective students. He also encourages his students to call him by his first name which many faculty members on campus practice. In regards to class assignments, Professor Fritzler never gives "zeros" on an assignment unless a student earns a zero.

    a.  **Fall of 2016**

The Fall 2016 semester was the first time Professor Fritzler had seen Ms. XXXXX in a year and a half since Spring of 2015. In the Fall of 2016 she was also enrolled in a course with which the professor assisted in with Professor Domek, MICR 4252, Cell Culture. Professor Fritzler's role in that class was to be present when Professor Domek could not be due to his other

commitments. She was also enrolled in Tropical Diseases, MICR 3403, with Professor Fritzler. Additionally, she was enrolled in organic chemistry in the Fall of 2016 which is a degree requirement and which she had already failed three times prior. It is also prerequisite class for CHEM 3070, Biochemistry.

During that time, in the first week of the semester and on other occasions in that semester Ms. XXXXX approached Professor Fritzler to help her get a job using her degree in Microbiology. Ms. XXXXX stated to Professor Fritzler on numerous occasions that the only reason she remained in the Microbiology major despite her academic performance was because of how Professor Fritzler made it a goal to assist all students achieve their success regardless of circumstance.

 Ms. XXXXX would always bring a voice recorder to these interviews and would also record all of Professor Fritzler's lectures. She started bringing it at the start of the semester for lectures and labs with Professor Fritzler's and Domek classes. Professor Fritzler had requested that he have copies for future references in his lectures of which Ms. XXXXX gave to him and he saved on his computer, but they were illegally removed from his computer along with almost all other files of his.

The complaint also mentions that there is evidence of recorded messages but none have ever been provided. Ms. XXXXX later told Professor Fritzler that the recordings were not to not miss any class information because she really wanted to try and make a turn around academically and this would allow her to go back and review all class material and discussions and because her husband was forcing her to carry it so that he could listen to everything she was during during the day.

At this point, Ms. XXXXX shared with Professor Fritzler numerous  personal aspects of her life, and she told the Professor that the reason she was not doing well attributed to a controlling husband and being forced to be at home all the time. She also would explain her personal / emotional stability issues such as suicidal thoughts.

Professor Fritzler told her that he would assist her as much as possible to be a successful student, just as he had done and does for other students. Professor Fritzler told her that she had a lot of potential based off what he observed in the Fall 2014 lab course but also noted to her his confusion on why she showed a complete lack of effort in the Spring 2015 semester.

She also told the Professor both early during the Fall 2016 semester and just prior to her dropping her courses in the Spring 2017 semester that her husband had been enrolled with Weber State as well prior and that he made her take a lot of his exams and go to his courses for him.

At the point in time that his exams started being offered in a secure testing center, her husband quit school when the school started requiring to show a picture ID during exams.

He later dropped out of Weber State University. Ms. XXXXX attributed all her issues at home due to his relationship and demands.

Professor Fritzler then understood as to why there were the stark differences, due to the psychological and emotional instability and due to the emotionally abusive and controlling nature of her husband.

During this time, Professor Fritzler never shared personal aspects of his life to her during that semester including things about his wife and never said anything personally to her directly or indirectly about his wife. Also during this time, Ms. XXXXX mentioned on numerous occasions during verbal conversations that students were talking about his wife and he and would go into detail about the activities students mentioned they had with the couple. Professor Fritzler denies any allegations that extend beyond the course and scope of the purpose of these conversations. There was only one occasion during that semester that Ms. XXXXX came to visit Professor Fritzler in his office, where Professor Domek was also present during the entire visit.

All conversations the parties had that semester occurred between classes, where they at times talked while the Professor walked back to the Tracy Hall Science Center, where the Professor's labs and office were located, from the Lind Lecture Hall where the tropical disease class lecture was. The parties also would talk just prior to tropical diseases lab beginning while the professor was setting up material or just after. As noted above, Ms. XXXXX was only in Professor Fritzler's office one-time which was mid-fall 2016 and was there to receive assistance from he and Professor Domek for an assignment in his class. Professor Domek was also present in Professor Fritzler's office at that time.

During this semester, Professor Fritzler's truck was damaged by another vehicle in the school parking lot. He noticed it prior to his MICRO 3403 Tropical Disease lecture. Professor Fritzler had to notify the University Police Department and his insurance company. Professor Fritzler explained to the entire class that day why he was late when he got there. However, he never talked about or used a rental car during that time or talked about his truck and its issues to his students thereafter through Canvas.

### i.      Physical contact and birthmarks

The only time physical contact occurred between Ms. XXXXX and Professor Fritzler was in the Fall of 2016 in Cell Culture lab. The room was a relatively small place with a minimum of 10

students and two instructors present at all times, and many times additional students and faculty from outside the class were present, all doing experiments in the lab simultaneously. The lab space was extremely crowded. With everyone running back and forth to use various pieces of equipment, gather supplies, ask questions, and confirm results, students and teachers would bump into each other at some point during the semester, if not everyday.

Professor Fritzler admits that Ms. XXXXX has seen and heard about his birthmark. During Professor's Fritzler infectious diseases-based lectures in his Tropical Disease course and sometimes during student presentations, the Professor discusses terms associated with the skin deformities / diseases. He often uses birthmarks as one example to help illustrate differences in terminology. Ms. XXXXX was in that course and heard that material as she was enrolled in that course that same semester. Professor Fritzler has online recorded lectures for an online class where that point in the discussion can be found, and had other recorded lectures discussing this same thing prior to them being illegally removed from his computer by the University

During the first week of the semester in lab, Professor. Domek and the Professor were trying to get equipment up and running which included a water-jacket incubator. They had to fill the water jacket and splice fifty-feet of tubing of different sizes together. One end was placed in the incubator in one room and the other end was attached to a distilled water tap to close the ceiling in another room.

None of the tubing fit well. The Professor's role was to stand on the lab bench while holding the tubing on the tap with one hand and using the other to hold a splice to prevent water leaks. There were various students monitoring the water level and using extra lab coats due to lack of paper towels to contain the water spillage.

To keep the tube from leaking, Professor Fritzler would have to constantly dry his hands on his clothes in order to get a grip on the tubing and maintain splices and connections. At one point during this array, Ms. XXXXX was present while Professor Fritzler was drying his hands with his shirt and saw his birthmark. At that time, she commented on having seeing "the birthmark that Professor Fritzler speaks about in his classes." There was no other physical contact than what has been described between Ms. XXXXX and Professor Fritzler.

### ii.    Spring 2017 Registration and literature review

During the Spring of 2017 registration period, Ms. XXXXX asked Professor Fritzler for assistance in helping her with her schedule to ensure that she would get the proper courses she needed to graduate in April of 2017. Based on credits she had remaining and assuming she would pass her Fall 2016 courses, (before Ms. XXXXX informed Professor Fritzler that she was

again failing CHEM 2310, Organic Chemistry) the Professor derived a Spring 2017 course schedule for her that would complete the requirements for graduation.

The first option was where she could take one of Professor Fritzler's directed research courses where students can do an independent research project. He advised her that she would be able to count two hours of this as elective credit towards her Microbiology major, and that she would have the opportunity to do a research project that would greatly help her in terms of employment and toward the initial goal she had when she originally approached Professor Fritzler at the beginning of the semester.

Because this directed research course would require a minimum of six hours per week spent in the research lab (two credit hours at a minimum of three hours of research per week per credit hour), Ms. XXXXX initially declined these research hours and associated research project that would have helped her obtain a job. Ms. XXXXX reminded him that she would not be able to spend time outside of regular classes in order to complete a research project due to her husband's behavior, lack of support, his requirements that she be at home at all times when she is not in class and the emotional trauma she endures as a result of his structure.

So instead, Professor Fritzler encouraged her to choose option two which was MICR 4830, Directed Readings. This is a course where students can read primary literature and/or books on a topic and write a paper on that topic, one that most faculty in the department normally require. Professor Fritzler told her that she could do this, or that she could do something that two other students, both males, were going to do with him during the Spring 2017 semester. This was an opportunity to let her review research that had already been completed, analyze the data, perform a literature review, and begin writing a manuscript for publication.

 The Professor had provided this same opportunity to several other struggling students, both male and female, in the past semesters. Professor Fritzler told her that by having a publication with her name included as an author would help with her job outlook and that doing this would also help her improve her written communication skills and critical thinking. Again, he iterated that this would greatly help her in terms of employment and toward the initial goal she had when she originally approached him at the start of the semester. Professor Fritzler's reason for encouraging her to take this second option was primarily because she initially declined the directed research hours and associated research project that would have helped her obtain a job.

Throughout these conversations, there were never any promises made about passing grades. Professor Fritzler never at that time, or thereafter, told her or indicated to her that she would not have to do anything in order to earn a passing grade. There was no further discussion about registration and Ms. XXXXX did not further discuss with Professor Fritzler what course she

ultimately decided to take for the Spring. The only contact Ms. XXXXX and the Professor had regarding this was when Ms. XXXXX wrote to Professor Fritzler through Canvas thereafter during finals week asking for the research data so that she could work on it over the break. Ms. XXXXX was aware during the registration period what the course requirements would be, and was aware that two other students, both of which were males, were also taking the same option with the same requirements that were provided to Ms. XXXXX. She never discussed this with Professor Fritzler during the Spring 2017 semester prior to dropping her courses after the first week of class. (See Directed Readings Material)

There were also no further interactions between Professor and student on this topic or any interaction described beyond this which the complaint alleges. There was no promise of any kind to Ms. XXXXX except for what Professor Fritzler advised above.

### iii.    Tropical Diseases exam credit

Professor Fritzler provided a computer-based take-home exam on the fourth exam in his MICR 3403, Tropical Diseases class. Professor Fritzler gave credit to everyone that missed that answer, male and female. There was no advantage given to Ms. XXXXX in any kind in this class or promises that would extend beyond the course requirements. The final grade that she did receive was based off her academic performance and the course requirements. (Exb. A) Ms. XXXXX ultimately earned an A in that class. Typically 2 / 3 of the class get an A and 1 / 3 with a B and or or two Cs. There are usually about 30 students enrolled in the class. Ms. XXXXX received the grade she received through her performance in the class and not due to any other claims outside this factual summary.

On December 5th, Professor Fritzler held a practical lab exam for his Tropical Disease class which was held at 12:30 PM. Prior to that, starting at 10:30 AM, the Professor was helping students review the materials needed to prepare for the class and was in his office prior advising students. Ms. XXXXX received a 78.3 on the lab exam, which was just above the class average and lower than her other lab exams. In this lab, most students receive a lower exam score on this exam than either of the two prior exams. The Professor tells them on the first day of class and throughout the semester that their third lab exam will be their lowest which can be confirmed by other students in the class as well.

### iv    Graduation issues

Halfway to three-quarters through the Fall 2016 semester, Ms. XXXXX told Professor Fritzler that she was failing Organic Chemistry for the fourth time and that her husband was forcing her to drop all of her courses for the Spring 2017 semester. Later, Ms. XXXXX ultimately did fail Organic Chemistry and that in turn, pushed-back Ms. XXXXX's graduation to December of

2017. And at that point, she realized that she would have to take Organic Chemistry again for the fifth time as she would have to pass this class before she could take Biochemistry. Biochemistry was not offered in the summer. So she would only be able to take it in the Fall of 2017 semester if she passed Organic Chemistry in the Summer of 2017.

### v.    Messages provided for Ms. XXXXX's claim for Fall 2016

There is no indication that the parties' had sex right before a final exam. There are also many alleged facts and stories about Professor Fritzler's past such as his relationship with his wife, past medical issues, a story about a prior wife and prior criminal charges which are not factually correct concerning the Professor.

There is also no evidence in the Canvas messages provided or otherwise that the parties met-up during Thanksgiving week for lunch at the Corner Bakery.

The messages also contradict each other and what is alleged in the complaint and the statement provided by Ms. XXXXX's husband, the witness statements that Professor Fritzler provides and the facts provided in this factual summary.

The Professor and his wife also share their private e-mail and both have access to the account. (Exb. B)

### vi. Final exams

The week of December 5-9, 2016 was the last week of classes. Final exams were December 12-15 and graduation was on December 16. On December 5th, Professor Fritzler had a meeting in the morning with faculty until 9 AM and thereafter was in his office to meet with students until 10:30 when he started helping with students prepare for his lab exam which was held at 12:30 PM. One December 12th in the morning, Professor Fritzler was helping his wife at her work working with the officer manager.  On December 20th in the evening, Professor Fritzler was with his wife Christmas shopping. He did not have the flu the week prior to that which required him to go to the doctor/hospital.

### Spring 2017 Semester

In the Spring Semester of 2017, Ms. XXXXX had signed up for Professor Fritzler's medical microbiology class again. The course of which she failed in the Spring of 2015. The class was held on Monday, Wednesday and Friday. This is not a required course to take for graduation. Ms. XXXXX did not have to retake this course to graduate as long as she had a GPA above 2.0

and that she took at least five credit hours of other Microbiology elective courses and passed them.

Most students retake the courses they fail. If a student retakes a course, the University counts the latest grade in the GPA calculation which most times is the higher grade. This was the reason for retaking her class, to take five hours of failed credit off of her academic transcript. This course is also an elective course of the 20 elective credits needed to graduate in Microbiology.

   **a.  January 9th encounter**

On the first day of class that semester, January 9th, 2017, the Professor had explained about a group research project and went over the details of that project and Professor asked all of the students to pick a partner for the projects by the end of the first week.

On that day, Ms. XXXXX approached Professor Fritzler at the conclusion of the class and Ms. XXXXX told him that she was likely going to drop all of her courses. Professor Fritzler asked her why and stated to him that she had no time to study and that she had no assistance at home and that her husband was forcing her to drop all of her classes and that he demanded that she be at home each and everyday to cook, clean and do his laundry while he was sleeping. During this conversation, she became distraught and began to cry.

She reiterated her issues with severe depression and suicidal thoughts of which she noted that she takes medication for but didn't take it regularly and issues with her husband at home and his/her academic dishonesty/integrity issues. Due to the fact that the students had to pick partners for the semester project, Ms. XXXXX said that she didn't want to force someone to be her partner due to the fact that her husband was telling Ms. XXXXX to withdraw from her classes and quit school.

She said that she was also most-likely going to drop her courses because she failed Organic Chemistry for the fourth time during the Fall 2106 semester, which put her off-course to graduate on time. Her husband was also telling Ms. XXXXX to withdraw from her classes and quit school because he wasn't going to pay for college due to her grades if all she was going to do was fail them.

She said that she had been keeping her grade results from her husband and because she didn't want him to know she had failed Organic Chemistry again but he ultimately found out which brought a lot of stress between the two. As a result, she also noted the unhappiness in her marriage. Professor Fritzler referred Ms. XXXXX to the Counseling and Psychological Services Center on campus and also recommended that she speak with the Dean of Students, Dr. Jeff

Hurst.

She did not drop her classes at that time but was visibly distraught during the remainder of the week.

### b.      January 13th encounter

On Friday of that week, Professor Fritzler made a comment to her after class that he was glad to see she was still in the course. She did not respond.

Later that day she sent a message on Canvas, which is the only Canvas message that Professor Fritzler is aware of and the only time that he communicated to her through Canvas for communication and which the University has not produced as evidence despite Professor Fritzler referencing it in his initial encounter with the University. She stated she would be dropping all of her courses over the weekend, and that it was due to her husband's demands.

She stated that he did not understand the value of a college nor did he care, and that he was not paying for her to go to school just to fail. She stated that she was considering filing for a divorce so that she could live the life that she wanted to live rather than be controlled mentally, physically and emotionally and so that she could one-day not rely on medication to help her sanity. However, she stated she had reservations of doing such for fear of how he would react and for fear that he would report her academic dishonesty issues since he had nothing to lose as he never planned on attending college ever again.

Further, Ms. XXXXX, without any prompt, went into detail about her husband and what she had discussed in the Fall of 2016, which was that in the short time her husband was at Weber State, he would force her to skip her classes to attend his while he stayed at home, he would force her to write her papers, to do all of his assignments and take his exams for him.

Ms. XXXXX further stated that her husband quit her classes when exams started to be given in a testing center and she could not gain access to them or take them for him. Professor Fritzler told her that if her statements were true, that it could result in consequences. Professor Fritzler did not report this at that time because of her heightened emotional and psychological instability. She further stated frustration with her husband and his lack of understanding the need of an education.

This Canvas message was not produced among all the other Canvas messages that were and were not produced. Professor Fritzler also mentioned this message that he received from her to Mr. Gomberg on January 27th. Mr. Gomberg asked why Mr. Fritzler had not reported the academic

dishonesty and Professor Fritzler said that it seemed like Ms. XXXXX's emotions were more speaking and that what he told Mr. Gomberg was considered his report. Mr. Gomberg told Professor Fritzler it could not and would not be considered any kind of retaliation for reporting it at that time because the complaint had not been filed yet. Professor Fritzler never asked  or mentioned that incident to the University again thereafter.

Monday the 16th, was Martin Luther King Day so there was no class. The next time class was scheduled was on January 18th. At that time, Ms. XXXXX did not attend that class and professor Fritzler assumed that she had already dropped the class and a student during class stated that Ms. XXXXX had a family emergency come up and said she wouldn't be going to the rest of the classes, and had dropped her courses.

**Sexual Harassment complaint filed**

### a.  Prior Encounter with Ms. XXXXX and her husband

On January 20th, Professor Fritzler's wife received a message from a stranger on Facebook alleging to be a student of the Professor and that they had an affair together. (Exb. D) Professor Fritzler's wife did not agree to the allegations and requested dates and times to verify when and where that happened. Later, the person communicating to her claimed to be the husband, using his wife's Facebook. Also that day was the day when Ms. XXXXX supposedly dropped all of her classes. A student can drop classes within three-weeks of classes and get a full refund which was most-likely the case here. (Exb. D)

Professor Fritzler's wife called to get an answer and there was no response. She called again and was able to talk to Ms. XXXXX who claimed that she could describe the inside of their house and she was able to describe the interior of their home.  The part that was described was the inside of the house which could be seen through the front-window of the Fritzler's home. She also claimed that she had this sexual relationship with the Professor and felt that she had to get into the relationship because he had power over her grades and that she could describe a birthmark on Professor Fritzler's stomach.  (Exb. C)

She also gave dates to Ms. Fritzler of the initial sexual encounters which were different than the ones provided in the complaint. Ms. Fritzler stated discrepancies on the dates she initially gave. These other dates were initially relayed to Mr. Gomberg thereafter in the Professor's initial meeting with him. The Professor's wife asked for the address of their home twice and she gave her an affirmative confirmation of the address of the home both times.Ms. XXXXX stated the home address to Professor Fritzler's wife on more than one occasion on the phone. This too was related to Mr. Gomberg during the initial meeting between he and Professor Fritzler.

Prior to this incident, Professor Fritzler and his wife noticed unusual activity around their home. One day, Professor Fritzler came home mid-day and noticed that there were tire tracks and footprints in the snow on the driveway and footprints in the snow leading to the back gates of their home. Professor Fritzler contacted his wife about this. Also, another time, the couple noticed that their dog peed and it was strung out on the carpet in the house. Their dog never does this unless the dog is mad or scared at something and they highly suspect that someone was unlawfully in their home. This was also related to Mr. Gomberg who demanded to Professor Fritzler that he report this to the police. Mr. Gomberg also told Professor Fritzler numerous times that doing so was required and was not and could not be considered retaliation.

### i. Alleged encounters that are not mentioned in the complaint

The complaint states four different times when the parties' allegedly had sexual encounters. However, there are two additional alleged-encounters. One mentioned in the Facebook message to the Professor's wife stating that they did it "in the back of your husband's truck at Weber State" which allegedly occurred in the winter months of the end of November to January 17th. There is also another alleged encounter in the Canvas messages provided that according to the messages, occurred on November 20th, 2016 and on December 6th, which are contradictory because they were never reported by the accuser, and should have been found by Mr. Gomberg had he actually completed a thorough and unbiased investigation instead of only trying to railroad Professor Fritzler. (Exb. C) (Exb. D)

### b. Meeting with Barry Gomberg

On January 26th, Professor Fritzler received a message from Barry Gomberg to come to his office the following morning without telling the Professor what the issue was about. The parties met on the 27th and Mr. Gomberg told Professor Fritzler about the sexual harassment complaint which was the first time Professor Fritzler heard about any other details of the complaint except for the conversation his wife had. Professor Fritzler from there told Mr. Gomberg about the strange conversations his wife had on the phone and Facebook with a student.

Mr. Gomberg told Professor Fritzler about some of the factual allegations and Professor Fritzler pointed out discrepancies in the facts, such as the claimant saying that she didn't know what address the Professor lived, since that was confirmed with his wife in the phone call, the issues about the home invasion of privacy and what Ms. XXXXX had told Professor Fritzler about her husband, her inability to study and him forcing her to cheat on exams, how and when Ms.

XXXXX saw his birthmark.

The complaint when it was filed also stated that the Professor will not admit to any wrongdoing, which the complainant would not have known had Mr. Gomberg not disclosed based upon he and the Professor's initial meeting and the Professor should have never had to of responded to or help prove or disprove the facts until an actual complaint was filed. Professor Fritzler learned that prior to Mr. Gomberg informing the Professor about these charges, he reached out to the Professor's supervisor Dean Matty and told him the specific details of the allegations and that he was allegedly told that Professor Fritzler was guilty of the charges.

At no time during any meeting or at any time thereafter was Professor Fritzler given an appraisal of his due process rights such as a right to an attorney. Professor Fritzler was told that the only assistance he could obtain throughout the entire case proceedings was from a counseling service that works with the university and from the university's Faculty Ombudsman who would only clear any confusion on University policies. (Exb. F)

After that initial meeting, Professor Fritzler received a message from his own personal e-mail stating, "Heard it didn't go with with Gomborg [sic] the other day. Well, it won't get any better." (Exb. G)

### i. Retaliation conversation

During that initial meeting with Mr. Gomberg, Mr. Gomberg told Professor Fritzler that he must report what happened at his home to the police and stated that it also would not be considered retaliatory as well as the incident on cheating on exams already mentioned and as already, mentioned it wouldn't be considered retaliatory because the complaint had not yet been filed. The Professor never called the police because there was nothing stolen, the snow tracks were gone and the only other evidence was the conversation that Professor Fritzler's wife had with Ms. XXXXX. However, Mr. Gomberg still insisted and demanded numerous times for him to call the police.

Again, upon the Professor leaving Mr. Gomberg's office that day, Mr. Gomberg made the final note to him to report those activities to the police. Professor Fritzler did talk to the police thereafter, and an investigation was never initiated because there was nothing they could do in regards to evidence.

Also during the conversation, Mr. Gomberg talked to Professor Fritzler about arrangements for Ms. XXXXX during this investigation. Mr. Gomberg told the Professor that they were going to

allow Ms. XXXXX to take Biochemistry during the Spring 2017 semester. Professor Fritzler at that time expressed his concern of allowing a student to take that course without having first passing the prerequisite of Organic Chemistry just for filing the complaint.

Professor Fritzler stated that it was not fair to allow numerous students who have tried and failed to make an attempt to take Biochemistry without taking Organic Chemistry in the past to try and speed-up their graduation. Those students were always told that they had to successfully complete the prerequisite of Organic Chemistry first. Mr. Gomberg acknowledged his concern. Mr. Gomberg stated that Professor Fritzler had every right as a faculty member to inquire about the prerequisite requirement, that it was his right and his responsibility to inquire about it, and that he should inquire about it.

A no-contact order was also entered on January 27th, before the complaint was filed. (Exb. E)

### ii. Ms. XXXXX's registration of other courses

As a result of the courses that Ms. XXXXX dropped the University allowed her to enroll in Chem 3070, Biochemistry, which has the prerequisite course of Organic Chemistry which Ms. XXXXX had failed for the fourth time. This has never happened in the five years of Professor Fritzler's tenure here for any student he knew and ever worked with.

The University also allowed her to register for MICR 3203, Immune System in Health and Disease. This is a three-credit hour online course that has never counted toward the microbiology major. Students in the past have asked for it to be and the department has always refused, which in turn allowed Ms. XXXXX to bifurcate the major requirements for her microbiology major.

Ms. XXXXX was also enrolled in both a Directed Readings course and a Directed Research course in order to make-up elective hours. Professor Fritzler was told by Dr. Domek that she would never show-up for those classes, and no Microbiology faculty ever saw her on campus and in the lab completing research.

### c. Filing of the complaint

Many facts that Professor Fritzler told Mr. Gomberg in confidence during their initial meeting on January 27th where thereafter communicated to the complainant and was later put into the complaint to either contradict what Professor Fritzler had said or to add additional facts into the complaint that was brought up by the professor. (Exb. E)

The complaint was filed three days later, on January 30th, 2017. The Professor received the

complaint on February 2nd. Mr. Gomberg requested a response to all of these allegations from Professor Fritzler on February 17th. At that time, no evidence had been produced for Professor Fritzler to respond to except the allegations in the original complaint and without specific dates and times on when and where the alleged sexual contact occurred.

Many times between those dates, Mr. Gomberg encouraged Professor Fritzler to bring a draft response to him and indicated that he would review it. (Exb. F)

### d. Second meeting with Barry Gomberg

On February 17th, as requested by Mr. Gomberg, the Professor drafted his own 23-page response and went to Mr. Gomberg's office to have him review it as he had been told to do. Professor Fritzler even called Mr. Gomberg beforehand to let him know that he had a draft prepared, to schedule this time to come by and ensure that Mr. Gomberg had time to sit and review it next to Professor Fritzler. Upon handing the draft to Mr. Gomberg in his office, Mr. Gomberg only looked at the last page number on the draft, and then slid it back to the Professor and didn't care to look at it and said that he instead wanted a signed final copy. (Exb. FF)

The Professor at that time refused to sign the draft response and inquired about who actually wrote the complaint for this case. Mr. Gomberg, numerous times,said that Ms. XXXXX had written it and Professor Fritzler responded that there is no way she could-have given her writing style in his classes. After blatantly lying to Professor Fritzler's face many more times and after Professor Fritzler pressing further, Mr. Gomberg finally admitted that he wrote the complaint himself for the accuser. He stated to the Professor that it is his duty as the AA/EO Executive to take student complaints and turn them into violations of University policy. Mr. Gomberg at this time also stated that he represented both parties, but that he drafted the complaint and took the initial intake of Ms. XXXXX and that anything the Professor told to him in confidence, he had already relayed and would relay to Ms. XXXXX. (Exb. F) (Exb. E)

At that time, the Professor who never gets mad, got upset and a verbal altercation ensued. Mr. Gomberg never read the response, demanded that Professor Fritzler leave it in his office, butthe Professor took it back with him. The Professor stated at that time to Mr. Gomberg his concern that he wasn't being impartial on this matter. Mr. Gomberg suggested that he could request another investigator be assigned to the case. (Exb. F)

Mr. Gomberg also mentioned on numerous occasions that faculty should have absolutely no contact with students outside the 50 minute class period. (Exb. F)

Thereafter, the Professor hired a private attorney to represent him on this matter.  His attorney

wrote a letter to legal counsel of the University requesting a change in investigators and for a request that his attorney fees be paid as promised under University policy, that the Professor's due process rights had already been violated at that time and that the sexual harassment policy the school had in place was inadequate to comply with federal and state law in a public entity. (Exb. H)

The school responded through the Attorney General's office stating that they didn't see any procedural deficiencies and that Mr. Gomberg would continue the investigation and denied any reimbursement for attorney fees. (Exb. I)

Dr. Fritzler was told by Dean Matty that University legal counsel Richard Hill questioned him and and said that Barry Gomberg was going to be pulled from the case as the investigator and that they (Professor Fritzler and his attorney) were "asking all the right questions and bringing up all the right issues." However, Mr. Gomberg was never pulled from the case as the investigator. Dean Matty was led to believe Mr. Gomberg was pulled from the case until Professor Fritzler told him otherwise just prior to his last day of employment at the University at the end of June 2017.

### i. E-mails from the Professor's own e-mail address

**After that meeting with Mr. Gomberg, Professor Fritzler received the following e-mail from his own account stating,**

"Heard it didn't go well with Gomborg [sic] the other day, well it won't get any better." Exb. G)

After the second meeting with Mr. Gomberg, Professor Fritzler received several e-mails from his own e-mail address. On March 1st, he received an email that said

"Do you really think an attorney will help?" (Exb. G)

On March 31st, David J. Matty, the Dean of College of Sciences put in a request for the proxy card audit trail for the Professor and cc'd the professor to his University email account. On April 1st, the following day, the Professor received an email from his own personal account with the included proxy request message from the dean stating:

"This is really going to help him?" (Exb. G)

### e. Letter for investigation request

Thereafter, the Professor's attorney on March 10th, 2017 sent a letter to Mr. Gomberg to request information in the investigation and for an extension of time to the response since it had initially been demanded to be in on February 17th. The letter was not a response to the allegations as no evidence had been produced to respond to at that time. His attorney described the complexity of this case and the need for more time than a typical discrimination claim such as a racial slur in the hallway. (Exb. J, K)

The letter mentioned a few issues with the case without any evidence presented, such as the home encounters, issues with any alleged electronic communication, issues with the alleged school encounters, issues with the complainant's academic performance, her mental stability, her credibility as well as the burden of proof she had to have to prove that, first the facts were true as alleged, and second, if the facts were true, that the facts would have to meet the legal standard that she invited the Professor to her home to have sex against her against her will in fear of facing expulsion. *Id.*

The letter specifically mentioned issues with electronic communication and a possibility of any electronic communication that was produced could be false and that it should be properly authenticated, whether or not they were text messages, which could be authenticated through the service carrier, e-mails, since he has a shared gmail account with his wife and any other evidence produced. Also since Professor Fritzler did not see any of the alleged canvas messages when he would log-into his canvas system.  In light of that, the Professor suggested ulterior motives as to why she would bring such an action in light of her academic performance and her relationship with her husband. *Id.*

The Professor also gave a long list of students that Mr. Gomberg should contact, including the students in both of his fall of 2016 courses that she was enrolled in, he requested that he contact all the family members of the complainant, he requested that faculty and staff be contacted for character witnesses and he provided a list of possible alibi witnesses that could be contacted, as well as witnesses that could confirm his birthmark appeared during lab while he was using his shirt to dry things, but still at that time, no dates or times had been provided on when these allegations occurred. The investigation report states it didn't need to look into the birthmark inquiry because there was already enough evidence to prove the alternative. *Id.*

Thereafter, Mr. Gomberg contacted Professor Fritzler through e-mail and asked why the Professor would not just admit the allegations brought against him. Mr. Gomberg thereafter called the Professor's counsel and again reiterated the same thing and said that he would be better off he would just admit to the allegations and that the evidence was "overwhelming." At that time, the Professor still had not received any evidence of the allegations.

The only witnesses that were contacted were those indicated in the investigation report which were faculty and staff members. One of these was Professor Domek who could-have verified the birthmark story in lab but was intentionally never asked about it by Mr. Gomberg. The other one was a faculty member for character and the final two were staff members in regards to the meeting at 8:30 AM on December 5th. No students or other alibi witnesses were contacted as requested by Professor Fritzler and no specific times were given on the days alleged for the Professor to produce statements at that time.

### f. First production of evidence

Also at that time, Mr. Gomberg stated that his secretary was still pulling and collecting messages on Canvas. The Professor was then provided dates on when some of the incidents occurred at that time, which was December 5th (in the morning at the Professor's residence), December 12th, (in the morning at the Professor's residence) December 20th (at night at Ms. XXXXX's residence) and January 17th (at night at Ms. XXXXX's residence). At that time, the times and specifics were still vague. (Exb. K)

However, on December 5th in the morning, Professor Fritzler's schedule was the following:

- 8:00-8:30am: Walk-in Advising Appointments in TY 201A
- 8:30-9:00am: Meeting with Jane Stout (College Academic Advisor) and Susan Himelright (Administrative Assistant) in TY 201B
- 9:00-10:30am: Walk-in Advising Appointments in TY 201A
- 10:30am-12:30pm: In TY 464 teaching lab helping students prepare their materials for lab exam in addition to preparing materials for our lab exam.
- 12:30-2:30pm: In TY 464 giving lab exam
- 2:30-4:30pm: In TY 436 for Dr. Matt Domek Cell Culture class
- 4:30-5:00pm: Travel to Davis Campus and preparation for evening class
- 5:00-5:30pm: At Davis Campus to meet with students needing additional help for evening class
- 5:30-8:30: At Davis Campus for evening class

Mr. Gomberg reached out to Susan Himelright and Jane Stout, in regards to the meeting they had at 8:30 am with Professor Fritzler. Mr. Gomberg had them just look at Professor Fritzler's public calendar which was dedicated to specific activities so faculty and staff may know when Professor Fritzler is free or not free for meetings.

Professor Fritzler also used a calendar specifically for suite 201 at the Tracy Hall Science Center

to indicate when he was available for walk-in advising and/or advising appointments. When students make appointments they used a scheduling website that linked them to Professor Fritzler's suite 201 calendar. Mr. Gomberg had both Susan Himelright and Jane Stout look solely at Professor Fritzler's public calendar, even after being told by Professor Fritzler to inquire about both. That calendar was intentionally never inquired into by Mr. Gomberg when speaking to witnesses.

Mr. Gomberg also inquired with them about any issues or concerns they have observed with Professor Fritzler and his interactions with his students and they both responded in the negative.

On December 12th, in the morning, Professor Fritzler was at his wife's work helping with computer problems. This was during finals week and he worked with Office Manager Alyson Yoshimura with the issues that morning. (Exb. C)

On December 20th, professor Fritzler was out Christmas shopping with his wife. He also visited patients with his wife during the latter part of the afternoon/early evening on this date. Upon completing all patient visits they went Christmas shopping. Their shopping was completed around 11 PM at night of which the parties went home and went to bed. (Exb. C)

On January 17th, Professor Fritzler and his wife had a family over, Jessica Thompson and Tyler Thompson and their kids that lasted until 9:15 pm. Thereafter, Professor Fritzler went to the school to retrieve some documents with his wife. (Exb. C) (See Proxy Access Card)

On April 8th, the University finally produced evidence in regards to the allegations in the complaint. They produced alleged canvas messages that occurred between the parties and they produced alleged e-mail messages that occurred between the parties. The e-mail messages were 137 pages worth of alleged conversations that occurred between December 3rd and January 14th. These are the dates when the alleged sexual contact occurred described in the complaint and were provided in a Docx form. Copies of the actual electronic messages were not provided. (Exb. L)

### g. Canvas messages

The canvas messages are 90 pages of alleged correspondence that occurred on the University message site between 10/18/16 and 12/02/16. Both the e-mails and the Canvas messages occur every single day and almost every single hour toward the end of November. This would infer that Professor Fritzler had his cell phone or computer on him non-stop and was messaging during meetings with faculty, during classes, meeting with students, preparing for classes, working with students, and spending time with his wife and friends.

There is a substantial amount of messages that occurred on Thanksgiving day, inferring that Professor Fritzler was engaged almost the entire day communicating to Ms. XXXXX while in front of his wife and friends, contrary to what actually occurred on Thanksgiving day. *(See witness Exhibit from Professor Fritzler's Friends Exb. C)* There are times in the conversation when something that is brought up completely out of context of the conversation.

There are times in the conversations when a person asks the other person a question and the same person answers that question instead of the other person, questions that require the other person to respond, such as the response when the correspondence shows Ms. XXXXX saying she got a Samsung Galaxy and then she responds to her own statement. The conversations also do not develop like they would with a normal relationship.

Everyday the conversations act like the parties are still getting to know each other and that they do not talk over the phone or in person. There also isn't a stop in the conversations. They are ongoing, indicating the two married parties only communicated solely through a public University education application to instigate a sexual affair. There are also times in the conversations were repeated questions are asked, such as an instance where Ms. XXXXX allegedly asks if he has kids on more than two separate occasions and the relationship between him and his wife.

Also, in the conversations, it states that Ms. XXXXX works from 10pm to 6am and there is conversation between the two parties the entire time she works.

Professor Fritzler has produced evidence and color-coded all of the conversations based off his school calendar, and other events where he was during those conversations as well as with the canvas conversations. There are also discriminatory comments against the Professor with constant references to him dealing with Roadkill since he is from Texas.

At the beginning, the conversations start around 10pm and then end around 6 am and then startup again at 10 pm. Then they start going from 10pm to 6am and then start again at noon. Toward the end of November, the messages are essentially non-stop throughout the entire day. There is also an incident in the messages where it clearly indicates the parties met up and had sex before any of the alleged dates claimed. The messages show an alleged incident on November 20th, 2016.

There are also factual comments, which is very little compared to the entirety of the communication, about Professor Fritzler going to the ER, owning a veterinary clinic and having an altercation with someone with a gun and other factual assertions which are false. The

conversations also indicate that Ms. XXXXX was the dominant one in this relationship, that she was the one that allegedly invited Professor Fritzler to her home and promised that her husband was not there and makes many many sexually explicit comments to entice him to enter into sexual activity almost everyday. The investigation report acknowledges this and admits this.

Finally, the evidence presented contradicts everything that is alleged in the complainant's complaint, the investigation report acknowledges this too.

### h. Unsigned witness statements

On April 17th, the University provided paperwork from individuals, the husband of the complainant, the father of complainant and two colleagues of Professor Fritzler. No other individuals were contacted as to the knowledge of the Professor. No students in either of the two classes were contacted. Also, the statements provided were unsigned and undated as to those who provided them. Professor Domek was not asked about Professor Fritzler using his shirt to dry things during lab that would have exposed his birthmark even though he was interviewed. Professor Craig Oberg, one of the faculty that provided a statement, even told Professor Fritzler on more than one occasion that Mr. Gomberg forced him to rewrite/alter his statement prior to Mr. Gomberg accepting it. (Exb. L)

Also, despite the fact that this was supposed to be a confidential process, Mr. Gomberg told Professor Fritzler's colleagues he spoke with what the allegations were about without Professor Fritzler's consent to do so. He also told Dean Matty what the allegations were about before the complaint was originally filed, without having collected the evidence at that time and said that the Professor was guilty of his actions before the investigation report was even filed and before Mr. Gomberg had even spoken to Professor Fritzler.

### i. Investigation Report

After the evidence was produced so that the Professor could properly respond to any evidence brought against him, on April 13th, 2017, the University issued its investigation report. (Exb. L) In the investigation report, it "assumes the authenticity of the electronic messages" despite the fact that it acknowledges that the Professor's attorney said that they could be counterfeit before even being allowed to see them. There was no look into the issues of authenticity in the investigation as requested by the Professor. Also there is no evidence that has been produced to verify or corroborate the authenticity of this electronic communication except for the statement of the husband on what allegedly occurred on January 17th. As to authenticity, this is what the report assumes:

"To believe that XXXXX somehow fabricated the volume of messages in the record would be difficult to imagine, under any circumstances. To conclude that she was able to place them in the Canvas record where Dr. Bret Ellis, Vice President of Information Technology at WSU, found them, is even more difficult to comprehend. Beyond that, the messages contained quite personal historical information about Fritzler that XXXXX could not have discovered without incredible research, if at all." (Investigation Report at 12)

Furthermore, in regards to the December 5th encounter, for the first time, the final report finally states a specific time on when the encounter occurred on December 5th, 9 am to 11 am, a time that Mr. Gomberg go from speaking to Susan Himelright and Jane Stout while inquiring about only one of the two calendars Professor Fritzler used. Had he inquired about the suite 201 calendar as Professor Fritzler requested, Mr. Gomberg would have been made aware that Professor Fritzler was with students during this time.

The investigation report also makes further allegations and findings on policies that were never alleged in the original complaint. In the original complaint, there are no policy violations cited. The only thing mentioned at the top of the complaint is sexual harassment. There are no charges as to a hostile work environment, consensual relations, violating anti-retaliatory provisions, or faculty responsibilities to students. (Exb. E)

There was no notice of amended charges to the initial complaint either. The only time these additional allegations were brought was in the final investigation report. There is no way the Professor could have responded to allegations that he didn't even know were initially brought against him.

Also, the University makes a finding that Professor Fritzler retaliated against Ms. XXXXX based on the original sexual harassment claims instead of actions that are actual retaliatory measures, which is retaliating against an individual for making a claim of sexual harassment. It also further suggests that the first time that Professor Fritzler met with the University, before the complaint was filed and before notice of his rights, and when he tried to explain his side of the story, that his home was burglarized, was retaliatory actions.

It also states that since Professor Fritzler disagreed with the arrangements of Ms. XXXXX getting around graduation requirements in light of filing this claim, that that was retaliatory action. It states that although he didn't follow through with his threats, his actions were "troubling" (Investigation Report at 21)

"The investigation report also concludes that Professor Fritzler created an intimate sexual

relationship with a reluctant student and encouraged her to enroll in her classes." (Investigation Report at 20)

And that "When a married faculty member lures a married student into a sexual relationship while simultaneously encouraging her to register for his classes, the creation of hostile environment is practically inevitable." *Id.*

> "XXXXX became so overwhelmed she dropped all her classes, less than two semesters before her anticipated graduation. This action dramatically demonstrated that the lingering effects of her past relationship with Fritzler were deeply disturbing to XXXXX. The question is whether Fritzler is responsible for XXXXX's acute discomfort with the prospect of encountering him in class and elsewhere on campus." (Investigation Report at 20)

Despite these conclusions made in the report, the report ultimately concludes that there is not enough evidence to prove sexual harassment, or unwanted sexual behavior, the very thing that Professor Fritzler was being charged with.

> "At a superficial level, it does not appear that Fritzler subjectively perceived that his advances were unwelcome. Fritzler's conduct was so highly manipulative, however, it seems quite possible that he did know, or, at least should have known, that he was maneuvering XXXXX into emotionally committing herself to him. It is reasonable to expect that someone in Fritzler's position would have understood that XXXXX did not genuinely welcome his advances." (Investigation Report at 19) However, "Given the burden on the complainant to present a preponderance of evidence that the conduct complained of was unwelcome, it is the determination of this investigation that while the sexual/amorous relationship was taking place, it did not create a hostile learning environment for XXXXX." *Id.*

This finding, admitting that there was not a hostile learning environment also admits on the same analysis, despite the fact that there is no analysis in the report, that no sexual harassment or unwanted sexual contact occurred.

These contradictory findings above state that Professor Fritzler created a hostile environment for Ms. XXXXX after the sexual relationship was discovered by her husband which caused her to drop all her classes. The report also states that even if Professor Fritzler now admits his misconduct, how could the University believe that he will ever do it again. (Investigation Report at 22)

It also admits that there was no evidence found to support the accusations of unwanted sexual behavior in the classroom that the complaint alleges after talking to several faculty members. (Investigation Report 13) However, the report states that that "isn't convincing enough," despite failing to produce any evidence to produce this assumption to the contrary, which then would be just based off of a mere hunch which has no evidentiary value. *Id.*

The report also admits "The flirtatious exchanges between herself and Fritzler, seem quite mutual." (Investigation Report at 18)

It further states:

> "XXXXX states that, at least during the early phase of her interactions with Fritzler and at some points thereafter, she continued the relationship with Fritzler because she felt she had to, not because she wanted to. *There is evidence in the record that casts doubts on that.* Her position would seem more plausible had she seemed more reticent with Fritzler, rather than often seeming to encourage him. Several times, Fritzler offers XXXXX an opportunity to back away from a sexual relationship. *While it seems evident that Fritzler hoped XXXXX would not avail herself of those offers, XXXXX did choose not to take them."* (emphasis added *Id).*

The report continues and admits that in light of the alleged sexual conversations through Canvas and e-mail and how both parties were interacting in the conversations, many times with the student being the instigator that *"This seems to go beyond what a worried student might say to a professor pressing her for a sexual relationship." (Investigation Report at 19)*

The report further states that since the Professor switched from having an intimate affair first solely through a Public University application, and posting sexual details on that application, and thereafter switching to private e-mail, as an effort to enforce the secrecy, that both the above factors "raise grave concerns regarding Fritzler's suitability to continue to work for the University."

Despite all of those findings in the report, the University made the final conclusion:

> "Because Fritzler fostered an intimate sexual relationship with a reluctant student and then encouraged her to enroll in his classes, he ran the risk of creating a hostile environment if the affair was discovered and the student regretted having become involved in it. Where those two things, as in this case, actually occurred, it is the conclusion of this investigation that Fritzler is responsible for the ensuing hostile environment XXXXX experienced. Together with the manipulative behaviors Fritzler

engaged in to draw XXXXX ever deeper into a relationship with him, this conduct constitutes a violation of the University's Discrimination and Harassment policy." (Investigation Report at 20)

The investigation report failed to find evidence against Professor Fritzler for sexual harassment, in which the complaint against him alleged despite failing to cite any required statutory policy, using Ms. XXXXX's own evidence she presented against her to contradict her original complaint, but made further findings and conclusions of school policy violations that were never alleged in the original complaint and of which Professor Fritzler was unaware he had to respond to. The University had to prove that the conduct was "pervasive in nature." Pervasive conduct is conduct of an unwelcome nature that occurs to frequently it would be taken by a reasonable person to create a hostile work or learning environment."

### f. Treatment of the complainant during the investigation

During the Spring 2017 semester, the claimant was allowed as told to Dr. Fritzler from the start to take a course (Biochemistry) without taking the prerequisite which she failed the semester prior (and three other previous times) which was Organic Chemistry, which no other student under Professor Fritzler's supervision had been allowed to do before despite their requests to do so. Additionally,

    a. The claimant was allowed to take a class that counted toward her degree which has never been counted toward a degree in her department (MICR 3203).

    b. Dr. Fritzler had to be in a different building according to the claimant's class schedule and he and all of his students had to bend around the student's schedule.

    c. After talking to other professors, Dr. Fritzler learned that the claimant, rarely, if ever attended her course that kicked Dr. Fritzler out of the building.

        i. Dr. Fritzler learned that the student didn't do anything in her directed research class and that she never met with her professor for that course.

        ii. There was another student who was one of the more academically dedicated students who did more of an effort in that course and she received an incomplete.

        iii. The complainant received an "A" for that course.

        iv. Numerous other faculty members stated that they never spotted her in the building completing research during that semester.

    d. As a result, this complaint being filed in light of the above-facts. the University has bumped-up complainant's graduation date despite her graduation date being delayed before this complaint was even filed or this investigation was completed. Had it not been for University intervention, the complainant would have had to take Organic Chemistry in the Spring of 2017 again and would not have been able

to take Biochemistry until the Fall of 2017. Instead, she was allowed to take Biochemistry in the Spring of 2017 of Organic Chemistry in the summer of 2017. Biochemistry is not offered in the Summer.

**g. Final findings and conclusions from the University Provost.**

After the University submitted their final investigation report and made their legal conclusions and recommendation that the Professor no longer be on campus from that investigation, and after the Professor filed his response, the University Provost, Madonne Miner thereafter sent a letter to Bret Ellis, the Vice President for Information Technology on June 9th, 2017 further investigating the issues of the validity messages produced.

   e.  Including IP addresses for e-mails sent on certain dates.
   f.  IP addresses for messages sent through the University system.
   g.  What method of communication the Professor used to communicate to students.
   h.  Whether or not Professor Fritzler can access canvas messages now.
   i.  Inquiry as to e-mail thread-heads and explanation for the differences.
   j.  Similar flirtatious and teasing messages to other students.
   k.  Inquiry as to the investigation and what happened when Dr. Fritzler's computer was hacked.
   l.  Access data to proxy card access in the building for December 5th and December 12, 2016.

From those inquiries, Doctor Bret Ellis responded to the questions and provided additional evidence. Professor Fritzler was never given an opportunity to respond to that additional inquiry. Furthermore, the University never remanded the case back to the original investigator for further inquiry.

   m.  In the response, Mr. Ellis states that there is no evidence that Professor Fritzler does not log into Canvas system for communication with students. (Paragraph 1)
   n.  In the response, Mr. Ellis states that the responses to students seem to be coming from a home Quest connection with a cell phone. Mr. Ellis assumes it was Professor Fritzler's, but no evidence was provided to make that conclusion. (Paragraph 2)
   o.  In Paragraph 4, Mr. Ellis states that some messages were from Weber.edu and some were from a home network. Still not stating where the home network was. Also indicating that some messages could not be seen depending on what network it was sent on, bolstering Professor Fritzler's claim that he did not have access to the alleged Canvas messages.
   p.  In Paragraph 5, Mr. Ellis responds to an inquiry about inconsistent e-mail timestamps that Professor Fritzler raised in his response. He responds to University e-mail timestamps. The issue was raised on private Gmail timestamps.

As such, the response is non-probative to what Professor Fritzler raised on the validity of the private e-mails that were produced.

q. In Paragraph 6 these are more messages that were produced that Professor Fritzler was not able to respond to. The messages were also found in the "trash" folder.

r. In Paragraph 7 in connection to paragraph 6, Mr. Ellis responds to a possible "hacking" of Professor Fritzler's computer. Mr. Ellis responds that it is less likely that "physical" hacking was possible. He doesn't respond to remote hacking. He doesn't give an explanation as to why the complaint Professor Fritzler made to IT about his concerns he had with his computer and why he was mistaken and the actual complaint that Professor Fritzler made in regards to access to his computer.In Paragraph 8, more information was provided that Professor Fritzler was never given an opportunity to respond to or was remanded to the original investigator for further investigation.

Thereafter, on June 26th, 2017 the Provost made a finding, relying on all the evidence produced being authentic, despite Professor Fritzler's claims otherwise, that there was no evidence for sexual harassment of which was alleged in the original complaint against Professor Fritzler despite the complaint failing to cite any actual University Policy violations for Professor Fritzler to respond to except for the heading which stated "Sexual Harassment."

a. Despite this, the University made a finding of Professor Fritzler violating the University Policy of:  "Consensual Relations."

   i. This was a charge that was never put into the original complaint of which Professor Fritzler was to respond to and an allegation that the student never brought before the school.

   ii. The policy violation was under PPM 3-32-a. (The letter admits that Ms. XXXXX's complaint did not contain a policy violation of PPM 3-32-a. 2nd page, 5th paragraph)

b. The University also found that Professor Fritzler violated PPM 9-5 which also was not contained in the original complaint.

   i. The University concluded that Professor Fritzler took advantage of the relationship "to exploit her for the faculty member's own purposes" under PPM 9-5.

   ii. The University states that the Petitioner may also have been exploiting for her own purposes but stated, "but that is not at issue here." (Last page first paragraph).

   iii. Despite this, the University admits that based on the evidence produced, that both parties expressed "their sense of commitment to the relationship" and found that the "sexual overtures were not unwelcome or severe" but instead noted that it was a "reciprocated sexual attention." which in effect

undermines the very definition of exploitation which is "treating someone unfairly to benefit from their work."

c. The University Concluded that the Professor receive a "written reprimand" and "acceptance of resignation."

    i. Professor Fritzler gave notice of resignation two months prior to the Provost even becoming involvedas a result of how the investigation was conducted, how he was treated unfairly during the investigation, the discrimination against him by the University and the hostile work environment created by University administration. He did not resign as a result of the findings of the University.

d. As a result of the finding of the policy violations, the University attached to the findings, sent a letter of reprimand stating that "An investigation instigated after an allegation of Sexual Harassment filed against you in January, 2017, brought to light compelling evidence of an exploitive sexual relationship with a student enrolled in your class. You neither informed a supervisor about the relationship, nor made alternative arrangements for evaluation of the student." The letter cites PPM 3-32a and 9-5. The letter never states why it was exploitive. Alternative arrangements were in fact made for the student.

Based on the findings and policy violations of the University, Professor Fritzler now appeals the University's decision pursuant to PPM 9-12 of both policy violations in the following manner:

### III.   ISSUES ON APPEAL IN REGARDS TO THE FINAL FINDINGS FROM THE UNIVERSITY PROVOST AND DUE PROCESS VIOLATIONS:

12. Professor Fritzler maintains and has maintained throughout this case, that the evidence brought against him was false and fabricated. *(see the Professor's Reply to the Complainant's Complaint and the University's Investigation Report)*

13. The University made a finding of policy violations that Professor Fritzler was never accused of originally and the University never amended the original complaint to show a policy violation.

14. The University violated Professor Fritzler's procedural due process, his right to notice and his right to respond to allegations brought against him and review evidence of allegations brought against him, his right to a hearing, his right to innocence until proven guilty, his right to review evidence, his right to make an oral presentation, his right to be tried before his colleagues, his right to have the accuser present the case and his right to cross examine any witnesses, and his right to appeal any recommendation for disciplinary action before the recommendation is sent to the University President.

15. The University failed to file a complaint against Professor Fritzler and ultimately found him guilty of claims and disciplined him without that complaint. There is no complaint pending with the Faculty Board of Review against the Professor.

16. The factual evidence relied on by the University Provost when she formally disciplined the Professor without due process does not support a finding of policy violation and the University failed to follow procedure in determining whether or not the disciplinary action was necessary.

17. The investigator on this case was not impartial. The University refused to change investigators at the request of the Professor.

18. His constitutional rights to remain silent, his right from unreasonable searches and seizures, his right to an attorney, his right to privacy and his fundamental right to his liberty in his profession and career and Weber State were all deprived by government interaction without due process of law.

19. The University did not follow their own policy for a formal procedure in this matter, they treated this matter like it was a formal proceeding, absent a formal hearing and instead found the Professor guilty of and disciplined him under quasi formal and informal proceedings absent the Faculty Board of Review.

20. The University's own procedure is lacking and violates the Professor's constitutional rights.

21. The Professor was never given the actual evidence used against him, the evidence contained unsigned witness statements with lack of that of the investigation, the Professor's evidence and claims were never investigated and he was never given a chance to respond to and examine the evidence that was entered when a reinvestigation had to be conducted due to the impartiality of the original investigator.

22. As a result of the procedural issues involving this case and with no formal complaint pending, the Faculty Review Board would not have jurisdiction to review the actual allegations but the punitive disciplinary action made made in violation of due process and school policy needs to be reversed and vacated as a result.

**(Given the sheer depth and vast amount of issues in this case which involves policy and procedure not abided by, the inadequacy of the procedure implemented, and the legality of the procedure implemented, appellant will attempt to outline all of the due process concerns in chronological order and lists some of the biggest concerns on appeal in the following points below and attempt to show how proper due process procedure should have been handled)**

**A.      Summary of how Weber State's Policy is Supposed to Implemented**

In a criminal case, on the side of the state, there is an investigator who are detectives or police officer, they investigate the evidence and find all facts and write-up a report that summarizes those facts. Thereafter, the facts are given to the Prosecutor. The Prosecutor screens the case and makes a determination on whether or not there is enough probable cause to file a criminal charge which is approved or determined by a judge. Once a charge is filed, a notice of the charges and information are given to the defendant.

Thereafter, the individual is still innocent, until proven guilty by a trier of fact, either through a jury or a judge. During the pre-trial stage, the prosecutor can attempt to approach the defendant

and or counsel and try and get the defendant to agree to a deal to settle the case. The case can only be settlement upon an actual contract between the parties and not a unilateral imposition of sanctions. If the case goes to trial because no agreement has been reached, after trial once the trier of fact has made a determination of guilt, a sentence is imposed. After sentencing, the defendant can appeal any of the matters.

The policy and procedure of this University are the same as explained below, despite them being inadequate to address due process and constitutional rights that County Prosecutors abide by. This is because the University being public is held to the same constitutional standards being a government actor.

However, in this case, Mr. Gomberg acted as the police officer, the prosecutor, the judge and the jury the Provost as well. What should have happened under policy, was Mr. Gomberg was to act as the investigator and gather the facts with a report absent legal conclusions. Thereafter, the Provost was to act as the Prosecutor, attempt to settle the matter and see if there was enough evidence to file a charge with the Faculty Review Board Chair who acted like a judge. The Board was to act as the jury to determine proof or innocence. Only then could the Professor be formally disciplined.

Instead, Mr. Gomberg investigated the case, wrote the complaint, filed the complaint, demanded a response from the complaint, made a factual determination and legal conclusions and recommendations. Thereafter, the Provost acted as the jury and the judge and made a factual determination and legal conclusions on charges that were never in the original complaint and then sentenced Professor Fritzler without first allowing to appeal the decision. This was also absent a hearing, and all other rights afforded under University policy.

If the Board believes that proper procedure and protocol was followed under their assumption of what is proper procedure and protocol, then the procedure the University applies at this time does not adhere to its own policy. It does not adhere to due process under its own policy and it does not adhere to constitutional protections guaranteed to Professor Fritzler from government intervention without due process of right.

## B.    Preliminary Due Process procedure statements:

*PPM 9-10 N Procedural due process - Refers to receiving adequate notice, right to an impartial forum, meeting of deadlines, completion of committee assignments and deliberative actions in accordance with and established policies and other procedural matters many of which are outlined in PPM 9. Due process will be deemed to have been afforded when the preponderance*

*of the evidence shows reasonable care in following established procedures. Only cases of prejudicial failure to meet procedural guidelines are to be considered cause for recommendations for hearings.*

*PPM 9-9 Due process / General Statement - Faculty Board of Review are to examine the reasonableness of the process. The seven essential elements include:*

    *a. Adequate notice of the charges or basis of the action*
    *b. An impartial decision maker*
    *c. An opportunity to make an oral presentation to the decision maker*
    *d. An opportunity to present evidence or witnesses to the decision maker*
    *e. A chance to confront and cross-examine witnesses or evidence to be used against the individual*
    *f. The right to have a representative present the individual's case to the decision maker and*
    *g. A decision based on the record with a statement of reasons for the decision.*
    *h. The purpose of the faculty Board of Review is to look for prejudicial failures of due process that might have resulted in an opposite recommendation in the case.*

In this case, Mr. Gomberg and and the Provost were decision makers. The Professor maintains that Mr. Gomberg was not impartial as explained further. He was not given notice of the charge he was disciplined for. He was not given a chance to confront and cross-examine witnesses or evidence used against him. He was denied the right to have a representative present the individual's case to the decision maker with the Provost when newly discovered evidence was presented. He was not allowed to make an oral presentation to both Mr. Gomberg and the Provost. The decision made is not adequate to explain definitions such as why and how the Professor exploited a student. All of which were prejudicial failures of due process that would have resulted in an opposite recommendation in the case.

*Professor Fritzler was found in violation of the policies mentioned based on the "preponderance of the evidence" which the U.S. Department of Education has now advised is not a sufficient burden to reach in this types of matter.*

    a. The Department of Education also withdrew their 2011 letter for guidance on sexual harassment investigations and found that "it placed improper pressure upon universities to adopt procedures that do not afford fundamental fairness."
    b. The letter also noted that many schools have procedures that "lack the most basic elements of fairness and due process, and are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.
    c. The department also admits that they issued the guidance letters without notice and opportunity for public comment.

d. As a result of this letter and explained above in this case, the U.S. Department of Education has now admitted to the fundamental unfairness of these investigations which can be clearly seen in this case, the very issues that Professor Fritzler originally raised on this matter.

## C.   Rights deprived during the pre-investigation and investigation phase.

### 1.   Rights of those accused; legal financial support

*PPM 9 -11 E 4 In the conduct of the preliminary investigation on the merits of the complaint, the responsible administrator shall exercise reasonable care to uphold the respondent's rights to due process. All investigations shall be conducted in a fair and reasonable manner in order to protect and or minimize the damage to the respondent's or the institution's reputation.*

As noted, how this investigation and unlawful adjudication was conducted damaged the reputation of the Professor among his peers and supervisors before a final investigation report was produced and the way this investigation was conducted in light of the foregoing violations damages the institution's reputation on following proper University policy, on conducting impartial investigations and recognizing and carving policies that protect individual's constitutional guarantees.

### i.   Financial legal support

*PPM 9-2.J. Faculty members have the right to financial and legal support from the University in litigation brought against them.*

Professor Fritzler was never afforded financial and legal support despite his request to University general counsel through his retained counsel the request of which was denied. He now Requests that the University reimburse him for the legal expenses he has incurred. Also, the approval of attorney fees is made by the Faculty Review Board. It seems that in this instant case, General Counsel unilaterally denied the Professor's request for reimbursement when he requested it without first going to the Faculty Review Board who has power to authorize such payments.

### ii. Appraisal of rights and procedure

*PPM 3 -32 The Executive Director shall inform the respondents of their rights and responsibilities during the investigation and shall overview the anticipated investigative procedures.*

This refers to the agency policy of which the complaint arose with Barry Gomberg. The Professor was not apprised of his rights as explained further.  It also states that the Executive Director shall overview the anticipated investigative procedure. The Professor was not apprised of the procedure and any explanation of the procedure was seriously misrepresented as noted in this appeal, especially in light of the Executive Director acting as if he was the chair of the Faculty Review Board and implementing procedures that applied to that process and not the informal procedure process.

   **2.     This complaint should have never been conducted at the informal level and was treated as if it was at the formal level.**

*PPM 3-32 2 b Complaints of serious criminal conduct such as sexual assault are inappropriate for informal resolution.*

Despite this, the matter was investigated and ultimately adjudicated on the informal level. Counsel for the Professor sent a letter to general counsel explaining to them that the policy and procedure the University had was inadequate to address a matter such as this and requested that a private investigator conduct the investigation in relation to impartiality issues and the University and a faculty member being implemented and that the policy the University had for sexual harassment claims were insufficient for a public governmental entity where there are more constitutional safeguards than a private entity has to face. The letter also mentioned policy and constitutional violations that had already occurred as a result of the manner on how the matter was investigated. Despite this letter and putting the University on notice, the University denied the request of the Professor and determined that everything the investigator had done to that point was perfectly sound under policy and under the law. (See letter sent to General Counsel and Response)

   **3.     Two investigations?**

*The policy states that if the complainant wishes to file a formal complaint the AA/EO office shall determine whether the complaint includes allegations that would constitute a violation of such policy and whether there is reasonable evidence to support those allegations. See PPM 32-2 V B 1. And if so, the AA/EO office will initiate an investigation.*

As such, the entire purpose of the investigation is to determine whether or not a formal complaint should be filed with a investigation report to back the reasons for filing a formal complaint. At that point, the procedure should have Mr. Gomberg submitting a report to the Provost for further review to see if a formal complaint was necessary to go to formal proceedings. On or about

January 27th, 2017 a formal complaint was filed against Professor Fritzler. Before that complaint was filed, there should have been an investigation report from Mr. Gomberg with evidence to back the reason for filing a formal complaint. If Mr. Gomberg filed a formal complaint, then he must have had reasonable evidence to support the allegations at that time and the Provost should have reviewed the report at that time.

Thereafter, the matter should have been filed within 10 days of January 27th, 2017, by the accuser to the Faculty Review Board to initiate a formal charge against Professor Fritzler and the procedure and policy of PPM 9-12 would have been the controlling authority at that time.

This did not happen. Instead, Mr. Gomberg filed his own formal complaint with his own department which did not follow PPM 9-12 discussed later. He wrote the complaint himself. He did not give the Professor a copy of the actual initial complaint from the accuser. He did not give the complaint to the Faculty Review Board for their review. Thereafter, Mr. Gomberg initiated another investigation against Professor Fritzler when the formal complaint was filed against him.

### 4.      Formal or informal proceedings?

Under the discrimination and harassment policies it gives five different avenues to conduct proceedings of charges of harassment. One of the procedures is to register a formal complaint with the AA/EO office. *See PPM 32-2 IV B d*. This is what happened in this case. If a formal complaint is filed, then as already mentioned, PPM 9-12 goes into play and the Faculty Review Board takes on the matter. Instead, Mr. Gomberg, acted as if he was the Chair of the Faculty Review Board. He filed the complaint, and followed the procedure outlined under PPM 9-12. He demanded a written response within 10 days of the filing of the complaint but did not allow a hearing within 45 days of the filing of the complaint. Mr. Gomberg even offered to write or help write the response for Professor Fritzler. Despite all of this, an investigation report was not issued until the end of April, 2017 and no formal complaint could have been possible until the investigation report was finished.

Additionally, the investigation and review and recommendation of the Provost were all procedures that are deemed informal under PPM 9-11 of the University policy. Despite this, the Provost admits in her June 26th letter that it was a formal proceeding. All formal, except for the most crucial part of a formal proceeding which is a hearing as as well as the right for it to be reviewed by the faculty review board. More violations on PPM 9-12 are discussed further below of what should have happened at the formal level.

In sum so far, the investigation should have not gone further as it did explained further below. Below is described as what happens on the informal part of a complaint, despite this not being an

informal matter at this point and the policy stating that a matter such as this is not proper for an informal review.

**5.    Lack of investigator impartiality**

**i.    Statements of policy applied to Mr. Gomberg as a faculty member and investigator of this matter.**

*PPM 9-8 B 1 Faculty members have a duty to obey laws of the state and the nation.*

Given the constitutional violations that occurred in this matter, this policy was violated here as explained below.

*PPM 9 - 8 B 3 Faculty members have the same rights and obligations as citizens.*
    *a.   The University will provide adequate protection from improper retaliation or other infringements of the accuser's civil or on the accuser's civil or professional rights.*
*PPM 9-1 College or University faculty are citizens, members of their learned profession and officers of educational institutions. When they speak or write as citizens, they should be free from institutional censorship or discipline.*
*PPM 9 -2 K. All faculty members have the right to work a place free from unlawful discrimination.*
*PPM 9 -7 2 Faculty members are to comply with all University rules and regulations specifying their obligations as faculty members and as members of the University community in general.*
*PPM 9 -7 3 Faculty members are careful that all institution property to their care is used properly and lawfully.*
*PPM 9-4 A Faculty's primary responsibility to their subjects is to seek and state the truth as they see it. They practice intellectual honesty.*
*PPM 9-4 B (in relation to subsection A) To this end they will continue their studies and research beyond whatever advanced degree or formal professional training they receive. They are obligated to keep themselves informed and knowledgeable about their field.*
*PPM 9-10 C A faculty member designated by the president, confirmed by the Executive committee of the Faculty Senate to represent the University during the informal and formal hearing process. This person shall serve as a neutral observer endeavoring to insure that due process is afforded to all parties in the proceedings.*
*PPM 9 -10 O The level of performance recognized in the profession as reasonable in light of obligations one has assumed, competing demands upon energy and time, the nature and quality of the work and all other circumstances which the academic community, after being fully*

*informed, would properly take into account in determining whether the respondent was
discharging responsibilities at an acceptable performance level.*
*PPM 9 - 13 5 Reasonable efforts will be made to obtain the most trustworthy and reliable
evidence available.*
*PPM 9 -6 1 Faculty members when properly requested through duly authorized administrative
and faculty agencies, comment in candor and fairness on the work of colleagues. In making
evaluation of the professional competence of faculty members, they use criteria that are directly
reflective of professional performance. They avoid personal attacks on their colleagues.*

### ii.      No appraisal of rights; no impartiality

In this case, the investigator Barry Gomberg approached Professor Fritzler about this  matter
without apprising him prior of his rights or what he wanted to talk to him about.  Professor
Fritzler told Barry Gomberg his side of the story. As a result of this, Mr.  Gomberg included
statements from that conversation into the initial complaint which was  drafted by him. Mr.
Gomberg also claimed that things would be a lot easier if he just admitted to the allegations and
made recommendations to disciplined him for not admitting to the allegations which the
Professor vehemently denied. The investigation  report also made allegations of retaliation
against the Professor for what he said at the initial conversation and found him guilty of
retaliation despite a complete lack of legal and factual feasibility for the Professor to retaliate in
this matter. *(See response to investigation report in Reply to Investigation report and complaint)*

### a.      Guilty before innocent

The investigator told Dean Matty that the Professor was guilty of this allegations before the
complaint was even filed. The investigator said that the Professor not admitting to the allegations
made things a lot worse for him. The investigator wanted to Professor to just admit to the
allegations before a final investigation report was issues. The investigator "assumed" that the
Professor had all of the evidence that the University had to prove their case.

The investigator "assumed" there were no issues with the validity of the evidence produced and
did not investigate into that matter. The investigator did not ask Professor Domek about issues
the Professor raised in the classroom. The investigator did not talk to other students in the same
class as the accused. The investigator did not contact any of the alibi witnesses the professor
provided. The Professor did not look into the mental health of the accuser. The Professor did not
look into the veracity of the claimaint's claims and ulterior motives and again, only "assumed"
their authenticity.

### b.     Illogical, non-factual, contradictory investigation report[2]

The investigator came up with legal conclusions in his final investigation report that did not have any factual basis to support those conclusions and the legal conclusions were contradictory. The initial complaint filed against the Professor drafted by the investigator made legal conclusions and finding of guilt before the investigation report was produced four months prior and before the Professor even knew of the formal complaint.

The initial complaint that was penned by the investigator were found to be contradictory to the actual alleged evidence produced. Furthermore, investigation reports are gathering and compiling of evidence and giving summary of the evidence. The investigator does not make legal conclusions or assumptions. They state the facts to have an individual make a fair determination on whether or not the proceedings should continue. Instead, the investigation report acted more a trial brief written on behalf of the accuser before going to a formal hearing.

Since a letter was sent to the University at the inception of the case stating all of the constitutional violations of which the University acknowledged to Dean Matty but refused to repatriate, as well as the yelling match that occurred between Mr. Gomberg and the Professor at their meeting in February, that Mr. Gomberg wrote the complaint himself, that there was additional pressure put on the investigator in light of his job and backing the allegations due to the letter sent to University counsel on putting them on notice.

In light of those concerns and the conclusions in the investigation report and the eventual overturning of those conclusions, it seems that that the investigator also had a motive to clear his name and back the allegations made in the complaint instead of make a fair and impartial investigation on sexual harassment and find the Professor guilty of something to back his reasons for investigating this matter in the first place.

### c.     Advocacy to the accuser

The investigator acted as an advocate for the accused throughout the process including the final investigative report instead of a neutral investigator. The investigator put a no-contact order on the Professor, despite his innocence until proven guilty and made him and his entire student body bend around the schedule of the accuser. The investigator expected the Professor to come up with a response to four months worth of investigation within and over a thousand pages of evidence to go over within 20 business days and denied a request for extension, "in the interest of the accuser."

---

[2] See reply to investigation report for further analysis

This is not how an investigation of such a serious nature should have been conducted especially with the University's own tenured faculty member involved and potential liability to the University for what occurred.

### iii.    Gender Discrimination and Retaliation [3]

This provision was violated in how the investigation was conducted which in turn unlawfully discriminated against Professor Fritzler because he was the male in the Investigation. Professor Fritzler filed a complaint with the State Equal Opportunity Commission as a result of the discriminatory actions brought against him which has been included with this appeal. (see letter sent to the EEOC)

In this case, how the investigation was handled, Professor Fritzler was retaliated against for the complaint a student made against him. There are no protections like this above against the accused and as such, the policies the University has implemented are discriminatory, and arbitrary and capricious and violates Equal Protection based on gender for sexual harassment complaints.

### iv.    Truth was not sought out as well as proper procedure and policy

In this case, the truth was not sought or stated. Professor Fritzler gave the investigator names of individuals who needed to be talked to including many students, Professor Fritzler also expressed concerns about the validity of the evidence produced. Also, the investigation report came out with legal conclusions which were not supported by fact and of which were contradictory.

The investigator was not seeking truth in this matter. The Professor maintains he was not impartial and he told the Dean of the Professor's section of academia that he was guilty of these charges before the charges were even filed. This is further confirmed with the University Provost overturning the legal conclusions of the the initial investigator as well as the Provost investigating the matter further despite the investigator already completing the investigation. Still, the matters inquired into were insufficient for the concerns that the Professor had raised.

It also seems that the University never checked with the actual accuser about the validity of the evidence proffered. Furthermore, as noted in this appeal, it does not seem that anyone from the University involved in this matter understood proper due process University procedures as explained in this appeal.

---

[3] See the Letter to the Equal Opportunity Commission in further analysis as to how this investigation was retaliatory and discriminatory.

This entire matter was adjudicated and conducted by the Provost and the EO office who were not designated individuals to conduct a formal complaint process which should have instead been headed by the Faculty Review Board.  *(See reply to investigation report) (See response from Bret Ellis to Provost) (See initial letter to general counsel and response)*

### iv.    No one delegated to oversee this matter

*PPM 9-10 C A faculty member designated by the president, confirmed by the Executive committee of the Faculty Senate to represent the University during the informal and formal hearing process. This person shall serve as a neutral observer endeavoring to insure that due process is afforded to all parties in the proceedings.*

It does not seem like such an individual was delegated in this matter. Richard Hill, University counsel did speak to Dean Matty and told him that issues brought to the University's attention were asking and raising all the right issues, however, they were never resolved or addressed. Also there was mention and switching investigators during that conversation which never occurred.

### v.    Useful fact-finding; below and beyond legality standards; violation of constitutional right to privacy.

*PPM 3-32 2 a The AA / EO office shall be required to conduct fact-finding as is useful to resolve the conflict and is necessary to protect the interests of the parties and the university.*

The investigator in this case did not protect the interests of the parties and the university. The investigator had bias from the inception as outlined in the documents. The investigator did not investigate or interview individuals the Professor had requested. The investigator made unfounded assumptions instead of actually inquiring into the matter as to the authenticity of documents.

The investigator did not follow-up with the accuser on concerns the Professor had. As a result, the University Provost had to further investigate the matter and evidence of which the Professor was never allowed to respond to or follow-up on and or clarify. The Professor maintains that the University never had his interests in mind and instead conduct a biased / illegal investigation and disciplinary proceeding against him.

Furthermore, the investigator went beyond the scope that it could investigate and the entire investigation was into the private affairs of the Professor. The University failed to find any

claims of harassment that occurred on campus. The investigation should have started for claims in the complaint of on-campus harassment and should have stopped there. The University **NEVER** investigated claims for on-campus harassment. Students from the classes that the complainant alleged harassment occurred were never interviewed. The statements of harassment that were made on campus were based off statements made that any other Professor would make to a student but instead were couched to make it sound like manipulation and harassment. Why? Because she carried a tape-recorder everywhere she went.

The Professor's attorney told the investigator of issues of investigation off campus and the scope the University had off campus. Despite that, the concerns were disregarded and the Professor's privacy rights were trampled on. And individual has a right to to privacy into the private affairs and concerns that occurs within the walls of his home absent a reasonable basis, appraisal of rights and a substantial reason for the investigation. The evidence procured and the legal conclusions have shown that no sexual harassment occurred on or off campus. Again, despite that, the University continued to delve into the private affairs of the Professor.

In first conversation the Professor had with the investigator, absent a forewarning of what the conversation entailed and absent the notice and appraisal of rights, the investigator asked the Professor how his relationship was with his wife. This went far beyond the scope of the investigation and the legality of questioning into the private affairs of the professor.

This should have never happened. The investigation should have never gone as far as it did. If the investigator found that there was enough evidence to file a formal complaint, then that is where the investigation should have stopped and a complaint should have been filed with the faculty review board. Instead, the investigator played the role of investigator, advocate for the accused, judge, prosecutor and delved much deeper into this investigation than it should have gone far beyond the scope of reasonableness which was highly objectionable to the Professor and his career and Professor.

As a result of the breadth and depth of the investigation and the divulging of the investigation to his peers, it affected the Professor and his personal life greatly and defamed his character and disgraced his reputation he had with the University. As a result, both he and his wife decided it was best to move back to Texas. This should have never happened. The investigation should have never gone that far especially with a lack of finding of harassment and contradictions in the allegations and the facts produced. This investigation was out to find a witch from the inception with disregard for the purpose, breath and legality of the investigation and puts serious question into how and why this University conducts this and any other investigations such as these.

        **a.**        **Illegal witness statements used to prove the truth of the matter**

**asserted**

*PPM 9-13 C The accuser may request witnesses be heard at any time in the proceedings.*

Never at anytime was the Professor allowed to hear witnesses during these proceedings. The witness statements that were provided in this matter were unsigned by the witnesses. Under the Utah Rules of Civil Procedure, this is a serious violation and the judge can issue sanctions against an attorney for filing statements without signatures under rule 11. Furthermore, the statements contain language which was included in the original complaint which the investigator admitted he had drafted himself as such, there is serious concern as to the validity of these documents, if they were actually prepared by the individuals they purport to be and serious concerns about possible falsification of documents in this investigation. The statements were also materially relied on in the investigation report Mr. Gomberg produced.

      vi.    **The University knowingly publicizing this matter to the Professor's colleagues**

*PPM 9 -13 6 Publicity by anyone involved in the proceedings should be avoided.*

The four witnesses that the investigator did interview that the Professor requested were only character witnesses and alibi for an alleged date. Despite this, two the witnesses that were interviewed solely based on character were apprised of the proceedings and the allegations made against the Professor. Furthermore, the investigator put on the Professor's public calendar of meetings with him for all other faculty to see. The investigator also told the dean of the Professor's area of academia and told the factual details of the allegations, before the actual complaint was filed and from the Professor's knowledge, that the Professor was guilty of those charges.

      vii.    **Constitutional Due Process Rights Violations of the 4th 5th and 6th Amendment and University Due Process Rights Violations**

*"PPM 9 -11 C Such preliminary investigations shall recognize the need for discretion and protection of Respondent's rights to due process"*

*(Faculty Rights) PPM 9-2 G Right of individual privacy and protection from unreasonable search and seizures of the space or equipment assigned to them by the University. PPM 9-2 H, The right to expect they will be considered innocent of all charges or complaints brought against them until proven guilty. The accuser shall have the burden of introducing sufficient evidence to support a complaint or formal charge.*

The University policy notes procedural process rights and constitutional rights such as the right to representation, the right to remain silent, the right to unreasonable searches and seizures, but does not implement policies to protect these rights.

As a result, all of these rights were violated in this instance case due to lack of policy from enumeration of rights. The University does not have a policy that complies with search and seizures, with the right to remain silent and the right to have an attorney present at all stages of the proceedings. If there are such policies that exist that are not enumerated under the PPMs, then those were violated as well.

### a.      Serious violations of the 4th Amendment in this case.

Under the 4th amendment of the federal constitution as well as guarantees under the state constitution, and under this policy, the Professor had a right to privacy of unreasonable searches of the space of equipment assigned to them by the University.

An individual has a right to be free of government intervention of searches and seizures of his papers and effects. What makes a search reasonable, the U.S. Supreme Court has found, is if the government approaches a neutral and detached magistrate and submits to them a statement of probable cause with a proposed order that identifies with particularity the items requested to be searched.

Thereafter, as a result of the warrant being signed by the magistrate, the government is allowed to legally search the papers and effects as well as space or equipment assigned to a faculty member. Anything less than this is a violation of the Professor's constitutional guarantees. In this case, the computer database of the Professor was searched.

Furthermore, Brent Ellis stated that e-mails sent came from a cellphone on a home network. If that home network was purported to be the Professor's then the University would need a warrant for that as well.

Additionally, since the home of the Professor is outside the jurisdiction of the University, they could not legally obtain that information absent help from local law enforcement. As a result, this policy and law was violated. The remedy is suppression of evidence. Furthermore, if an individual brings evidence at the request of the government, then that individual is a government actor. As such, the e-mails that the complainant produced also required a warrant. No such warrant was produced. It violated the Professor's rights to unreasonable searches and seizures. The University has no policy implemented to protect such rights and this violation occurred as a

result.

### b.   There was not a presumption of innocence since the inception of this case.

Also, the Professor was presumed guilty before any formal complaint was  brought against him. The Professor had to prove his innocence instead and was not  afforded the process that was due to him to illegally make him prove his innocence or for him to be innocent until proven guilty. The original complaint was drafted by the investigator with definitive statements toward the Professor of guilt, and proposed sanctions indicating further lack of impartiality.

The investigation report thereafter had definitive statements of guilt without a factual and legal basis as well as the provost's report. The investigator also wanted the Professor to just admit to the charges before the production of any evidence or the issuing of the investigation report and said, "It would be a lot easier on him if he did." The investigator also brought the evidence to prove and support a formal complaint, not the accuser. The investigator also took the liberty of telling Dean Matty that the Professor was guilty of sexual harassment before the Professor even knew of any allegations brought against him back in January of 2017.

The sheer lack of investigation on behalf of the Professor and the disclosing of this case to his colleagues of the charges against him when they were only interviewed and character witnesses also goes to show further issues of impartiality and the lack of presumption of innocence.

### c.   Violation of the 5th and 6th Amendment

*PPM 9-13 6 Respondent may elect to remain silent .*

The investigator never told the Professor of the right to remain silent and his right to an attorney at the inception of this case. These charges were serious charges with possible criminal implications. Furthermore, since the investigator was a government actor looking to solicit statements from the Professor, he had to apprise the Professor of his right to remain silent and his right to attorney. Instead, the investigator talked to the Professor without telling him of the meeting beforehand, wanted a response from the Professor, of which the Professor denied all allegations and continued and still continues to do so.

The investigator demanded a response to the complaint within 10 business days without production of evidence which wouldn't be made until three months later. The investigator talked to the professor and elicited statements from him that was used against him. During this time, the

Professor was unaware of any complaint made against him. This also violated the Professor's 5th amendment right to remain silent from government interrogation.

In connection with this right and the right to an attorney under this policy and the 6th amendment, the Professor had a right to an attorney with the accuser made a complaint with the University. The Professor had to an right to an attorney when the investigator originally approached him. The Professor had a right to an attorney when Mr. Gomberg told him to come to his office with a response to the complaint filed against him. The Professor had a right to an attorney during the formal proceedings brought against which were never afforded him in this matter.

Also, if an individual is retained by an attorney, the other party must speak to the representative and not the Respondent. Despite this, Mr. Gomberg felt that he could still talk to the Professor without his attorney and would CC the Professor on correspondence sent to his attorney.

Also, in regards to impartiality, the investigator held the illegally elicited statements from the Professor against him and suggested to impose severe punitive disciplinary action against the Professor for denying the claims against him, the right of which he had, as it was not his duty to prove his guilt and the right of which he had to tell his side of the story which he maintains are the actual truthful details.

### iix. U.S. Department of Education admits due process failures and policy that led to impartial investigations. [4]

On September 22nd`, 2017 the U.S. Department of education issued a letter admitting that the policies and procedure guidelines they gave to Universities in 2011 violated due process and revoked the 2011 letter and 2014 guidance at that time. The guidelines and procedures in the letter made it so it was focused on the innocent before guilty mentality and making the investigation look like a mere formality for the accused instead of an actual partial investigation. The U.S. Department of Education now admitting guilt in this matter further adds to the Professor's argument of impartiality in implementing what was recommended by the Federal Government and further affirms the due process concerns that the Professor raised through counsel at the inception of this case.

## D.    Rights deprived at post investigation stage

### 1.    After the  investigation report was issued there is a hearing that needs to be held on the issues:

---

[4] See attached letter from the U.S. Department of Education

*Doctor Jason Fritzler*
*Weber State University*
*Faculty Review Board Appeal 53*

*PPM 3 - 32 3 a d The policy states that there are two hearings in this type of proceeding but they can be consolidated into one with the appropriate hearing panel in relation to discrimination complaints.*

A hearing was not held on the informal level. The hearings were not consolidated. The Professor was never afforded a hearing on the formal level.

## 2.      Thereafter there is the requirement of a formal conciliatory meeting:

*PPM 9 -11 E 1 In the informal conciliatory meeting, the respondent has the right to written notice of the complaint and to receive copies of the materials or documents gathered during investigation of the complaint.*

This meeting was never held.

*PPM 9-13 2 The respondent has a right to review, with or without counsel present, pertinent information, materials or other evidence gathered during or as a result of any preliminary investigation.*

The Professor was never given the actual purported e-mail messages from CANVAS and instead, the investigator "assumed" that the Professor had access to the actual originals, further indicating impartiality of the investigator and the AA/EO office"transcribed" the messages instead of producing the actual written messages. The statements from individuals used for evidence were unsigned statements and had the appearance of Mr. Gomberg dictating the statement.

Using the same word of "grooming" which he used drafting the complaint and in the statement of the father, the word of which was scrutinized in a letter to Mr. Gomberg through the Professor's legal counsel and the word of which was again used in the final investigation report. Furthermore, Professor Fritzler was never given the actual initial complaint that Ms. XXXXX filed before Mr. Gomberg filed the initial complaint. There was said to be text messages which were never produced.

Professor Fritzler was also never given the opportunity to examine and respond to any evidence produced from Bret Ellis after the University had to reinvestigate the matter. There were many issues with the requests made, apart from additional 4th Amendment violations, in that Mr. Ellis

responded to the University e-mail stamps and any issues with those. The concern was the private e-mails produced and the time-stamps on those.[5]

Furthermore, Mr. Ellis states assumptions as well on his response such as the Tracy building be the most secure and not susceptible to hacks and also completely sidesteps whether or not someone can remotely hack a Professor's computer. He only addresss a student actually physically accessing a computer.

Given that these issues were not properly addressed it also puts into question the validity of the investigation and concerns that the student that made this complaint had different motives in making this complaint, namely, attempting to find a way to graduate after failing Organic Chemistry again and her graduation date being pushed back.[6] This also gives serious concerns on whether or not the University in their impartial and flawed investigation, aided and abetted the complainant in possibly committing fraud against the University and the Professor.

### 3. The final report from the Provost
#### i. University Findings

*In the final report from the Provost, there was a finding of a violation of PPM 9-5 and PPM 3-32 a. These policies was never listed in the formal complaint and the later policy is a policy that Mr. Gomberg cannot be found disciplined as it violates due process.*

> **a. In regards to PPM 9-5, the University found that the professor exploited the student without giving a factual basis for making that finding.**

The University fails to cite to evidence that was "exploitive for the faculty member's own purposes" on behalf of the professor.

The University contradictorily asserts that based on the alleged evidence produced:
  i. both parties expressed "their sense of commitment to the relationship"
  ii. and found that the "sexual overtures were not unwelcome or severe" but
  iii. instead noted that it was a "reciprocated sexual attention."
  iv. which in effect undermines the very definition of exploitation which is "treating someone unfairly to benefit from their work."

---

[5] See Reply to Complainant's Complaint and Response to Investigation Report as to why these issues were raised on the validity of the private e-mails.
[6] Additionally, the school never produced the complainant's grades which were put into question in her complaint.

v.    There is no evidence of unfair treatment from the conclusions and findings of the University and no evidence of the Professor benefiting from that unfair treatment.

vi.   The University also states that Mr. XXXXX may have been "exploiting" the
The Professor as well. If that is true, then a further investigation would have to be determined on who was exploiting who, if there was even any exploitation at all based on the alleged facts and again based on the truthfulness and reality of the alleged facts presented.

As such, there were no findings of exploitation, and the findings in the actual report contradict any possible factual findings of exploitation.

**4.      The University also erred when it made a finding in the written reprimand that the evidence was "compelling" it should have been under the correct standard "a preponderance of the evidence" and the U.S. Department of Education has found that the evidence standard is a violation of due process.**

**5.      Unlawful disciplinary action against the Professor**

**"Before imposing punitive actions, the University first must determine if the violation does not call for punitive disciplinary action and are reasonably assured that subsequent violations by the respondent would not occur."**

**A.      *Administrative disposition***

*When the administrator believes there is reasonable cause that a violation of University policy has occurred, an administrative disposition may be sought. At the disposition, the administrator shall see if the disposition is equitable and appropriate. If the conditions of the disposition are acceptable to both respondent and the accuser no further proceedings shall be necessary.*

*If the disposition results in a disciplinary action other than verbal censure, a written copy of the disposition shall be signed by the responded, accuser and responsible administrator. If the complaint is not dismissed or resolved during the meeting, the matter shall move forward to a formal hearing, if one of the parties files a formal charge. Id. at 5. PPM 9 -11 D5 5 (The language makes it seem that the disposition is the same as the informal conciliatory meeting or occurs at the meeting)*

**B. *Factors that must be considered before imposing disciplinary action:***

*Before disciplinary action can be imposed, it first must be determined that a violation has occurred and its imposition may serve to:*

      vii.    *Assure self-improvement and reform.*
     viii.    *Deter violation of respondent.*
      ix.    *Reinforce academic freedom and the right and responsibilities of faculty members. (Defined under PPM 9-3 and PPM 9-8)*

*PPM 9 -11 D 3 the responsible administrator overseeing the case shall see that the provision of the administrative disposition is equitable and appropriate for the violation.*

### C. Faculty member rights and additional factors that must be considered

*PPM 9-2 I, Faculty members have the right to be judged by their colleagues in matters of discipline with established due process and solely on the basis of the faculty member's professional qualifications and professional conduct. An individual private lifestyle shall not be a factor in these judgments unless that lifestyle Raises serious question of the faculty member's ability, willingness or professional fitness to perform University duties and 2. Constitutes a violation of the standards of behavior listed in PPM 9 -3 through PPM 9-8.*

### D.    Need for a written copy of disciplinary action signed by the parties / settlement conference

*If the administrative disposition results in a disciplinary action other than verbal censure, a written copy of the administrative disposition shall be signed by the respondent, accused and responsible administrator.*

*PPM 9 -11 D 6 In the event that no settlement is reached, the accuser may prepare the written charge.*

*(Faculty Rights) PPM 9-2 H, The right to expect they will be considered innocent of all charges or complaints brought against them until proven guilty.*

### E. Discussion of parts A - E applied to this case

      **i.    The administrator can only attempt to settle the matter, not unilaterally impose punitive disciplinary action.**

The rules talk about an informal conciliatory meeting and a disposition. It seems that the disposition is brought-up at the informal meeting where a proposed remedial action is brought before the respondent. The remedial action is discussed and the above-factors are noted and considered at the meeting before proposing punitive disciplinary action.

Furthermore, the rules at the informal level talk about settlement and if no settlement is reached. The rules also call for all parties to sign the agreed-upon disposition. As such, the proposed disciplinary action at this stage can only be agreed-upon by all parties. This is congruent with the fact that faculty members have a right to be judged by their colleagues in a matter of discipline, meaning through the Faculty Review Board. If no settlement is reached, then a formal charge is filed. As already mentioned, how this action played-out, the University used the informal proceedings as if they were the formal proceedings themselves. A charge should have been filed with the faculty review board instead of the Provost imposing action herself.

As a result, in this case, the Professor was not judged by his colleagues in matters of discipline through the faculty board of review and it went beyond that of just a verbal censure. Instead, Professor was invalidly judged and disciplined punitively by the University's provost without a formal hearing, without his written consent, without proper service and notice of the the charge.

In addition, this was not a settlement agreement. Since a disciplinary action was imposed through the written reprimand and acceptance of resignation, that violated the Professor's due process rights.

Furthermore, the Provost in disciplining the Professor did not go through the factors in her letter mentioned above in subsection B and subsection C and did not determine the Professor's fitness to perform his duties.

This action result more than verbal censure. It resulted in written reprimand and the unlawful acceptance of the Professor's resignation which had no connection as to why he resigned. The disposition was not signed by the Professor, the accuser and the responsible administrator.

Finally, the Professor had a right to be innocent until proven guilty. The only way he could be found guilty was with the Faculty Review Board and at a formal hearing with his right to cross-examine witnesses present witness and give an oral presentation with the accuser having the burden to prove her case with a formal charge. None of these happened before punitive disciplinary action was brought against the Professor. The investigator found the Professor guilty before he filed the formal charge and was not impartial throughout the proceedings.

The investigator found the Professor guilty in his investigation report acting as a judge instead of a report of the facts. The Provost did the same with her findings and report. He had a right to innocence until a formal hearing was held. Instead, he was disciplined and judgment was imposed while he was still legally and procedurally innocent without the approval of the Faculty Review Board, without their findings of facts, without their recommendation to the University President and without the approval of the University President.

What occurred was a severe violation of due process. If this is how the University normally conducts matters like this against faculty members and the process that has happened in this case does not seem odd, then there is a severe problem with the implementation of the University's own policy which makes the matter further arbitrary and capricious.

*PPM 9 -17 II A Termination for cause includes violation of the responsibilities states in the case PPM 9 -2 through 9 - 8.*

Furthermore, the termination for cause can only be on a violation of the above-named provisions. The termination for cause under PPM 3-32a was unlawful.

> **ii.      Under University Policy, the acceptance of resignation was not a proper or possible form of punitive punishment outlined under PPM 9-14. A non-punitive action can be voluntary resignation which what happened here and was not related to a disciplinary action against the Professor.**

*The University could not use the "acceptance of resignation" as a form of punishment against Professor Fritzler.*  This case involves a voluntary resignation from the professor in light of how he was treated, harassed, discriminated against and humiliated in front of his peers during the investigation process and violations of his privacy and his due process rights.  As a result, the "acceptance of resignation" is procedurally impossible and this punitive disciplinary analysis was not conducted since the Professor had already resigned. If the University were to impose an acceptance of resignation, the Professor would have had to sign the disposition and then *thereafter* resign as a result of signing the disposition.

*The disciplinary action recommended does not comply with PPM 9-2, B-5 right to participate in University Governance. PPM 9-2, C right to due process in connection to 9-9. PPM 9-2 G right of individual privacy and protection from unreasonable search and seizures of the space or equipment assigned to them by the University. PPM 9-2 H, The right to expect they will be considered innocent of all charges or complaints brought against them until proven guilty. The accuser shall have the burden of introducing sufficient evidence to support a complaint or formal charge.*

All this rights above were violated which are further explained in this appeal. As a result of how the investigation was conducted and the lack of impartiality with the investigator,  the no contact order that was entered against the Professor before any kind of legal  adjudication, the Professor was presumed guilty before any formal complaint was brought against him. The Professor had to prove his innocence instead and was not afforded the process that was due to him to illegally make him prove his innocence or for him to be innocent until proven guilty.

The original complaint was drafted by the investigator with definitive statements toward the Professor of guilty. The investigation report thereafter had definitive statements of guilt without a factual and legal basis. The investigator wanted the Professor to just admit to the charges before the production of any evidence or the issuing of the investigation report. The investigator also brought the evidence to prove and support a formal complaint, not the accuser. Also, the right to
University governance was denied at the informal and formal level as described herein.

### iii.    Consensual relationships

*PPM 3-32 a Consensual relationships, when such a conflict of interest exists, the University member with evaluative responsibility will notify his or her immediate supervisor who will make alternative arrangements with other qualified personnel in order to eliminate or mitigate the problem. [7]*

In this case, despite the Professor still alleging that the complaint made against him never occurred, the facts in the complaint and the evidence received contradicting itself and the reliability of the evidence in serious questions and the Professor providing alibi witnesses to prove such, which was ultimately disregarded by the University and alternative arrangements were in fact made which eliminated the problem and the University cannot now further discipline the Professor for a problem that has been handled properly, without a formal hearing, without going through the disciplinary factors and without authority to discipline the Professor under University policy.

The policy calls for concerns of unfair treatment to students in regards to the grades they received. Due to what occurred in this case, the University cannot prove any unfair treatment due to the change of circumstances and also do to the fact that this relationship never existed based.

---

[7] In the response to Barry Gomberg's Investigation Report, Professor Fritzler further describes how this policy on its face deprives individuals of due process of law based on assumptions and not on factual inquiry as well as an individual's constitutional right to privacy. (See Response to Investigation Report)

As noted in the reply to the investigation report, this was also a violation of the Professor's right to privacy afforded him and the basis for this policy and what occurred is not congruent with the disciplinary action made against the Professor, it is also a violation of his constitutional right to privacy many of the things that were investigated should not have been investigated and were outside the reach of the University. At the first interview with Mr. Gomberg, the investigator went as far to ask as to how his relationship was with his wife. This is not a proper or legal investigation that the University can inquire into. The policy overreaches its bounds in regards to privacy rights.

Furthermore, the Professor cannot be disciplined under this policy. He can only be disciplined under PPM 9-5. The factual policy violation can show issues related to compliance with PPM 9-5 but cannot be a reason for punitive disciplinary action of which happened in this case.

**E.      Rights deprived after no resolution is met with the disposition and the informal conciliatory meeting**

**(This is what should have happened if no settlement agreement is reached and the following of which never occurred in this matter and the Professor was illegally disciplined without following the procedure below, but the University and how the imposed and disciplined and came to legal and factual conclusions on this matter and issued a formal complaint and required procedure under whas is discussed below acted as if a formal process did occur).**

**1.   The filing of a formal charge by the accuser which never occurred**

*PPM 9 -11 D 6 In the event that no settlement is reached, the accuser may prepare the written charge consisting of a concise statement of the facts conduct or circumstances reported to constitute failure to comply with the standards contained in (this) documents and within ten working days of the informal conciliatory meeting, deliver copies of the formal charge to the chair of the Faculty Board of Review. Failure to meet this deadline will result in dismissal of the complaint.*

An informal conciliatory meeting was never held. It seems like copies of formal charges were never sent to the chair of the Faculty Board of review. These procedures were never followed. A complaint was never filed with the Faculty Board of Review and as such, the disciplinary action made against Professor Fritzler needs to be reversed, retracted and removed from his file. If the letter from the Provost is considered the conciliatory meeting, then the accuser had 10 days to file a formal charge at that point after June 26th, which never occurred.

2.      **Initiation of disciplinary proceedings which were bifurcated**

*PPM 3- 32 3 If there is reasonable cause to believe the respondent violated this policy, the Appropriate Administrator may initiate disciplinary proceedings against the respondent as may be appropriate.*

In this case, the appropriate administrator was the Faculty Board of Review for Faculty members. The University Provost and Mr. Gomberg only had the authority to make a finding of reasonable cause of a policy violation to submit to the Faculty Board for an official complaint to initiate disciplinary proceedings against the Professor and or attempt to negotiate a resolution with the Professor. Instead, the University investigated the matter, and disciplined the Professor unlawfully with the proper administrator and which was inappropriate in a matter regarding sexual harassment under school policy.

3.      **No due process as a result of the bifurcation of disciplinary proceedings**

*PPM 3 -32 3 b Respondents who are faculty members are entitled to due process as set out in PPM 9 - 9 and 9 - 14 Completion of the investigative procedures of this policy may, at the discretion of the provost, constitute completion of a preliminary investigation outlined in PPM 9 -11.*

As noted in this policy, the investigation with the Provost is only a preliminary investigation and not a formal adjudication. The bifurcation of the Faculty Board of Review for formal procedures violated the rights described above and in this appeal. The Provost admitted in her report that she treated the matter like a formal proceeding and the complaint that did not follow proper procedure or contain the policy violations that the Professor was ultimately found guilty of and demanded a response within 10 days shows that Mr. Gomberg treated this as a formal procedure as well, except for the most crucial part being of which an actual hearing to determine the facts.

4.      **Procedure necessary to file a formal Charge which never occurred**

*PPM 9 -12 II Any person may file a formal charge with the chair of the Faculty Board of Review, but only after the respondent has been informed of the nature of the alleged infractions, and an informal conciliatory meeting has been held of the matter has been transferred to the formal hearing level as described in PPM 9 -11. The faculty Board of Review may in its discretion decide not to hold a formal hearing on the charge, if it is determined to be frivolous, without merit, based on purely personal grounds or on issues that are beyond the boundaries established by the statements of rights and responsibilities in PPMs 9 -2 through 9 - 8 or if it is determined to be an abuse of the intent of due process. Within 10 working days following receipt of the*

*charge, the chair of the Faculty Board of Review shall inform the respondent in writing of the formal charge. No adverse action or sanction may be taken against a respondent until notification of the charge is given to the respondent except as may be mutually agreed upon in the administrative disposition resulting from the informal conciliatory meeting as described in PPM 9 -11.*

In this case a formal charge was never filed with the Faculty Board of review as such, there is not a formal charge for the Faculty Review Board to Review which makes this case more bizarre. Respondent was never informed of the alleged infractions and a conciliatory meeting was never held. A complaint was filed against the Professor, but it not follow the process required under these rules as explained below.

The Professor maintains that the charge is without merit on the facts. He was never informed by the faculty Board of Review of the formal charge. And there has been a severe abuse of intent of due process as already discussed. Despite this, Professor Fritzler was still disciplined for what occurred by the University Provost. As such, the illegal disciplinary action made against the Professor needs to now be vacated.

        **i.**      **What the charge must contain and how to properly serve the individual which never occurred.**

*PPM 9 -12 II A 1 Written notice of the formal charge from the chair of the Faculty Board of Review shall be delivered personally or by certified mail to the respondent.*
>    *a. A concise statement of the formal charge, summarizing the facts, conduct or circumstances. A copy of the applicable canons and regulations shall be included with the notice.*
>    *b. A statement of the action proposed to be taken in the event the allegations of noncompliance are sustained by the Faculty Board of Review.*
>    *c. The time and place of the pre-hearing conference and of the formal hearing before the faculty board of review.*
>    *d. The rights and responsibilities of the respondent and the accuser in the formal hearing.*
>    *e. The current membership of the Faculty Board of Review.*

*PPM 9-10 I - The formal charge, is a concise statement of the complaint, summarizing the facts, conduct or circumstances to constitute failure to comply with the standards set forth from PPMs 9 -3 through 9 -8. The formal charge is issued to the chair of the Faculty Board of Review who in turn informs the respondent.*

In this case the charge did not come from the Faculty Board of Review, it instead came from Barry Gomberg. The charge was not delivered personally or by certified mail. A copy of the applicable canons was not included. A statement of the action proposed to be taken in the event of the allegations of non-compliance sustained by the Faculty Board was never proffered and instead an actual disciplinary action was made against Professor Fritzler without authorization of the Faculty Board of Review with the written reprimand and the "acceptance of resignation."

       **ii.**      **There was no notice of violations of PPM 9-5 and PPM 3-32a in the charge that was unlawfully processed.**

There was no mention of any policy violations, except for the header which stated sexual harassment claim. The complaint had no mention of the policy violations that were summarized in the final investigation report and in the final disciplinary action decision made by the University Provost, named PPM 9-5 and PPM 3-32a.

Furthermore, as noted in the policy above, the University has no authority to file a complaint against or investigate under PPM 3-32a since the University only looks at policy violations of PPM 9 - 3 through 9 -8 for disciplinary action. The complaint also did not state the right of the Professor as already discussed. It also did not state the current membership of the faculty review board.

The violation of PPM 9 -5 should have been in the charge and should have described why the actions were "exploitive" and should have described the Professor's ability to perform his duties. Also, the office of which this complaint originated did not have authority to investigate a violation of PPM 3-32a. That office only had authority to investigate discrimination and harassment matters. No harassment was found, so the investigation and proceedings should have ended there.

       **iii.**     **The contestation of the charge and how it was unlawfully carried out on the informal level before the investigation was finished and evidence was produced.**

*PPM 9 -12 II A 1 Respondent who wishes to contest the formal charge shall, within 10 working days, file a written answer to the charge with the chair of the Faculty Board of Review.*

Professor Fritzler was never apprised of this opportunity. Instead, the investigator Barry Gomberg demanded a written answer to the charge before any evidence was produced to base the charge. Thereafter, the investigator, after composing and filing the complaint himself,

demanded that a response be filed within 10 business days in February of 2017. The investigator said that he would "help" the Professor draft a response.

However, when the Professor arrived at his office with a response, the investigator demanded that the Professor sign the response right there. Thereafter, at the end of April, 2017, evidence was finally produced to substantiate the claim to the Professor. The investigation report came days after the report was produced.

The investigator at that time again demanded that the Professor provide a written response to the investigation report within 10 days shortly after finally giving the Professor access to hundreds of pages of evidence that had never been provided him with the investigator assuming that he had the evidence all along.

As a result, the investigator, without authorization, acted as if he was the chair of the board of review and made recommendations and demanded a written response as if he was the chair of the board of review and demanded. Thereafter, the Provost followed through on disciplinary action against the Professor without being the board of review to make a determination of disciplinary action and without being the President of the University who authorizes disciplinary action.

As a result, how this matter was handled was arbitrary and capricious, violated school policy, bifurcated the power vested in the Faculty Board of Review and with the President of the University as well as other procedural due process errors.

The right to a hearing before a finding of guilt and disciplinary action imposed absent a settlement agreement.

### iv.   The hearing that was never held before the Professor was unlawfully disciplined

*PPM 9 -11 D 5 If the complaint is not dismissed or is not resolved by administrative disposition during the meeting, the matter shall move forward to a formal hearing, if one of the parties files a formal charge.*

*The chair of the Faculty Board of Review shall schedule a formal hearing for a time no later than 45 working days from the time the formal charge was initially received.*

*PPM 9 - 10 L Pre hearing conference, a meeting held after a formal charge has been filed with the chair of the Faculty Board of Review. At this meeting, initiated and conducted by the chair, the issues to be examined at the formal hearing are delineated.*

*PPM 9- 13 7, 8 Respondent has a right to attend meetings of the Faculty Board of Review and a right to retrieve records which are in his name, has a right to present evidence at the formal hearing and call witnesses to testify and to a formal hearing.*

*PPM 9 - 13 4 During the formal hearing, the accuser will have the right to call and present witnesses to testify. The accuser will have the right to direct cross-examination of the respondent and witnesses or to submit questions to the Faculty Board of Review for its inquiry.*

*PPM 9 -13 3 The decision will be based upon the evidence gathered and heard during the informal and formal procedures.*

*PPM 9 - 13 2 Adequate time including adjournment during formal hearings, shall be granted to enable either party to investigate evidence to which a valid claim of surprise is made.*

*PPM 9 -12 also states the procedures for the formal hearing and pre-hearings.*

*PPM 9 -13 B 1. Accuser bears the responsibility of showing, through a preponderance of the evidence, that adequate cause exists to continue the hearing or to find cause against the respondent. Such evidence shall be determined from the record when considered as a whole.*

*PPM 9 -12 IV Findings of the formal hearing: The board shall issue the decision, the reasons for the decision and the recommendation. If the Faculty Board of Review finds a violation sufficient to warrant disciplinary action, the Board shall recommend action as authorized by PPM 9 -14.*

Since the process above was bifurcated, Professor Fritzler was never afforded the opportunity for a formal hearing and was instead disciplined without it and without his right to be be tried before his colleagues. The policy notes that it is the Faculty Board of Review that finds a violation sufficient to warrant disciplinary action.

He was never given the right to present witnesses and the accuser never presented witnesses at a hearing. The accuser never had to present her case. The decision is to be based on the informal and formal stages. The decision was only based on the informal stage with the University acting as if it was the formal stage.

Also, the accuser never properly filed a former charge so the Faculty Review Board cannot now issue a hearing absent that charge. The accuser.

> **v.   The right to appeal the disciplinary action to the President before it is imposed which the Professor was never afforded.**

*PPM 9-13 9 Respondent has the right to appeal in writing the recommendation of the Faculty Board of Review to the president, within ten days of the date of the recommendation.*

As noted, no recommendation was made from the board and the Professor was never afforded the chance to respond and appeal the disciplinary action made against him before it was entered. A written letter of reprimand was issued concurrent with the Provost's factual findings. And as already noted, it wasn't a recommendation, it was the actual disciplinary action. As such, the Professor was never afforded the right to appeal to the president before he approved of the disciplinary action.

In summary, all seven due process rights outlined under PPM 9-9 were violated in this matter. Everything occurred was at the informal level and it was acted upon as if it were the formal level and the informal level under policy, should have never occurred for an allegation such as this.

## IV.    REQUEST TO THE FACULTY BOARD OF REVIEW

As a result of the foregoing mentioned procedural, substantive and constitutional due process violations and factual inconsistencies that materially prejudiced the Professor, Professor Fritzler now requests that the disciplinary action brought against him be removed from his permanent file, that these proceedings be dismissed for failure to state a claim through the procedure of the policy and for failing to charge the Professor with the University provisions he was disciplined.

### A.    Formal complaint and investigation into how this case was handled.

*The Professor also requests that the board consider this appeal as a complaint against the individuals named in this document that were involved in this investigation for the policy violations mentioned above and whether or not disciplinary action is necessary for how this matter was handled.*

## V.    REQUEST FOR REIMBURSEMENT OF ATTORNEY FEES

The Professor also requests that his attorney fees be paid which the University affords him under policy for adjudication proceedings brought against him. The request was denied without consent of the Faculty Review Board who have the power to approve of such funds and also as a result of having to defend himself against this arbitrary and capricious, illegal, biased matter that was fundamentally unfair under policy and under the law.

This request is also made based on the fact that the Professor's attorney had to conduct his own investigation on this matter after receiving the investigation report from the investigator and a request for an impartial investigator which was denied which further violated the Professor's rights. This request is also made due to the fact the Professor's counsel raised these concerns to the University in February of 2017 of this fundamentally unfair procedure and University General Counsel instead denied and or ignored this request and maintained that the process to that point was legally and fundamentally sound, despite telling Dean Matty otherwise.

This request is also made as a result of what occurred on this matter, the Professor's Counsel now essentially has to give the University legal advice on their own University Policies and Procedures, point out flaws to their process that violates the constitution and flaws that violated the Professor's due process rights. This is also in light of the fact that the University advocated for and adjudicated this matter for the accuser on the dime of the University.

It would be fundamentally unfair to make the Professor have to pay his way through this process, especially given the fact that the one allegation that he was originally accused of despite a listing of the actual policy violated, has now been dismissed and as a result, technically legally and procedurally, there should not be any policies that the Professor should have been found in violation of and illegally disciplined.